UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Romell Broom, | ) | Case No. 1:10 CV 2058 |
| | ) | |
| Petitioner, | ) | |
| | ) | JUDGE CHRISTOPHER A. BOYKO |
| -vs- | ) | |
| | ) | |
| Charlotte Jenkins, Warden, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Respondent. | ) | |

## INTRODUCTION

On September 15, 2009, the State of Ohio attempted to execute Petitioner Romell Broom by lethal injection.  Broom was sentenced to death in 1985 for the rape and murder of Tryna Middleton.  However, the execution team could not access a vein to administer the lethal drugs – despite more than a dozen attempts over two hours – and the procedure was aborted.  The State intends to try again in June 2020.  Broom has filed in this Court a second-in-time Petition and Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his death sentence and seeking to bar a second execution attempt.  (Docs. 1, 18.)  Respondent Warden Charlotte Jenkins has filed a Return of Writ to the Amended Petition (Doc. 21.) and Broom has filed a Traverse.  (Doc. 30.)  For the following reasons, the Court denies Broom's Amended Petition.

RELEVANT PROCEDURAL HISTORY

**A.      Broom's Conviction and Initial State and Federal Challenges**

Broom was convicted by a jury and sentenced to death in October 1985 in an Ohio

state court for the rape and murder of Tryna Middleton.  *See State v. Broom*, 40 Ohio St. 3d

277, 277-80 (Ohio 1988) (providing a detailed account of Broom's crimes and

prosecution).  Broom's conviction and sentence were affirmed on direct appeal.  *See State*

*v. Broom*, No. 51237, 1987 WL 14401 (Ohio Ct. App. July 23, 1987); *Broom*, 40 Ohio St.

3d at 280; *Broom v. Ohio*, 490 U.S. 1075 (1989).  He was unsuccessful in state post-

conviction proceedings.  *See State v. Broom*, No. 72581, 1998 WL 230425 (Ohio Ct. App.

May 7, 1998); *State v. Broom*, 83 Ohio St. 3d 1430 (Ohio 1998).

Broom then sought federal habeas relief.  In June 1999, he filed a Petition for Writ

of Habeas Corpus in this Court, asserting thirty grounds for relief.  (*See* Case No. 1:99 CV

30 ("Habeas 1"), Doc. 13.)  After conducting an evidentiary hearing on certain of his

claims in January 2002 (*see* Habeas 1, Docs. 100-05), another judge on this Court denied

Broom's Petition in August 2002 (Habeas 1, Doc. 113).[1]  The Sixth Circuit Court of

Appeals affirmed that ruling.  *Broom v. Mitchell*, 441 F.3d 392 (6th Cir. 2006), *reh'g and*

*reh'g en banc denied* (Aug. 9, 2006).  The United States Supreme Court denied *certiorari.*

*Broom v. Mitchell*, 549 U.S. 1255 (2007), *reh'g denied*, 549 U.S. 1363 (2007).

Soon after, Broom returned to state court and filed a successor Petition for Post-

Conviction Relief in the trial court in which he asserted among other things, a claim under

_____

[1] Judge Kathleen O'Malley initially presided over this case.  The case was transferred to
Judge Christopher A. Boyko on November 14, 2011.  (Doc. 4.)

2

*Brady v. Maryland*, 373 U.S. 83 (1963).[2]  *See State v. Broom*, No. 91297, 2009 WL 2263824, at *4 (Ohio Ct. App. July 30, 2009).  Broom's Petition ultimately was denied. *See id.* (reversing trial court's dismissal of petition); *State v. Broom*, 123 Ohio St. 3d 114 (Ohio 2009) (reversing court of appeals), *reconsideration denied*, 123 Ohio St. 3d 1475 (Ohio 2009).

Broom then filed a Motion in this Court seeking relief from the Court's earlier judgment dismissing his Petition so that the Court could reopen the case and address the *Brady* claim that was the subject of his post-conviction review.  (Habeas 1, Doc. 133.)  The Court denied the Motion.  (Habeas 1, Doc. 141.)  The Sixth Circuit affirmed that judgment. (Habeas 1, Doc. 145.)

### B.     The Failed Execution Attempt

In the midst of Broom's post-conviction proceedings, on April 22, 2009, the Ohio Supreme Court set Broom's execution date for September 15, 2009.  *See State v. Broom*, 122 Ohio St. 3d 1497 (Ohio 2009).

The execution, however, was not carried out.  Despite repeated attempts over two hours, the execution team could not access a vein to deliver the lethal injection.  The Ohio Supreme Court set forth the following facts relating to the failed execution attempt:

*Facts of September 15, 2009*

Broom was transported to the Southern Ohio Correctional Facility ("Lucasville") on September 14, 2009, in anticipation of his execution

---

[2] In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment."  *Brady,* 373 U.S. at 87.  Broom raised this claim in his first federal habeas Petition, but this Court declined to review it because Broom had not exhausted it in state courts. (*See* Habeas 1, Doc. 113 at 43-49.)

scheduled for the next day. Upon his arrival at Lucasville, a nurse and a phlebotomist conducted a vein assessment and found that Broom's right-arm vein appeared accessible, but his left-arm vein seemed less so. Prison officials communicated this information to Edwin C. Voorhies Jr., the regional director for the Office of Prisons of the Ohio Department of Rehabilitation and Correction ("ODRC"), and the medical team assured him that this would not present a problem.

At 1:59 p.m. on September 15, the warden finished reading the death warrant to Broom. One minute later, Team Members 9 (a female) and 21 (a male) entered the holding cell to prepare the catheter sites.

Team Member 9 made three attempts to insert a catheter into Broom's left arm but was unable to access a vein. At the same time, Team Member 21 made three unsuccessful stabs into Broom's right arm. After a short break, Member 9 made two more insertions, the second of which caused Broom to scream aloud from the pain.

Member 21 managed to insert the IV catheter into a vein, but then he lost the vein and blood began running down Broom's arm. When that occurred, Member 9 rushed out of the room, saying "no" when a security officer asked if she was okay.

Director Voorhies testified that he could tell there was a problem in the first 10 to 15 minutes. Warden Phillip Kerns saw the team make six or seven attempts on Broom's veins during the same 10–to–15–minute period. According to Kerns, the team members did hit veins, but as soon as they started the saline drip, the vein would bulge, making it unusable.

About 15 minutes into the process, Kerns and Voorhies saw Member 9 leave the holding cell. Voorhies described her as sweating "profusely" and heard her say that she and Member 21 had both accessed veins, but the veins "blew." Member 17 then entered the holding cell and made "several attempts" to access a vein in Broom's left arm. Simultaneously, Member 21 continued his attempts on Broom's right arm.

Terry Collins, who was then the director of the ODRC, called a break about 45 minutes into the process to consult with the medical team. The break lasted 20 to 25 minutes. The medical team reported that they were gaining IV access but could not sustain it when they tried to run saline through the line. They expressed "clear concern" about whether they would get usable veins. But because they said that there was a reasonable chance of establishing venous access, the decision was made to continue.

4

By this time, Broom was in a great deal of pain from the puncture wounds, which made it difficult for him to move or stretch his arms. The second session commenced with three medical team members—9, 17, and 21—examining Broom's arms and hands for possible injection sites. For the first time, they also began examining areas around and above his elbow as well as his legs. They also reused previous insertion sites, and as they continued inserting catheter needles into already swollen and bruised sites, Broom covered his eyes and began to cry from the pain. Director Voorhies remarked that he had never before seen an inmate cry during the process of venous access.

After another ten minutes or so, Warden Kerns asked a nurse to contact the Lucasville physician to see if she would assess Broom's veins and offer advice about finding a suitable vein. Broom later stated that he saw "an Asian woman," whom he erroneously identified as "the head nurse," enter the chamber. Someone handed her a needle, and when she inserted it, she struck bone, and Broom screamed from the pain. At the same time, another team member was attempting to access a vein in Broom's right ankle.

The Lucasville physician confirmed that she came to Broom's cell, examined his foot, and made one unsuccessful attempt to insert a needle but quickly concluded that the effort would not work. By doing so, she disobeyed the warden's express instructions to observe only and not get involved. The physician examined Broom's foot but could see no other vein.

After the physician departed, the medical team continued trying to establish an IV line for another five to ten minutes. In all, the second session lasted approximately 35 to 40 minutes.

During the second break, the medical team advised that even if they successfully accessed a vein, they were not confident that the site would remain viable throughout the execution process. The governor's office had signaled its willingness to grant a reprieve, and so the decision was made to halt the execution for the day.

Dr. Jonathan Groner examined and photographed Broom three or four days afterward. The photographs show 18 injection sites: one on each bicep, four on his left antecupital (forearm), three on his right antecupital, three on his left wrist, one on the back of his left hand, three on the back of his right hand, and one on each ankle. Prison officials later confirmed that he was stuck at least 18 times.

Dr. Mark Heath met with Broom one week after the event. Dr. Heath observed "considerable bruising" and a lot of "deep and superficial" tissue damage consistent with multiple probing. Dr. Heath also posited that the actual number

5

of catheter insertions was much higher than the number of needle marks, because according to what Broom told him, the medical team would withdraw the catheter partway and then reinsert it at a different angle, a procedure known as "fishing."

*State v. Broom*, 146 Ohio St. 3d 60, 61-63 (Ohio 2016).

> **C.  Broom's Initial State and Federal Litigation Challenging Any Further Execution Attempt**

On September 18, 2009, three days after the failed execution, Broom filed a civil rights action under 42 U.S.C. § 1983 in the United States District Court for the Southern District of Ohio, challenging Ohio's lethal injection execution protocol and seeking to prevent the State from attempting to execute him again. (Case No. 2:09 CV 823 ("§ 1983 Case"), Doc. 3).[3]  In an Amended Complaint, Broom argued, among other things, that a second execution attempt would violate the Eighth Amendment's prohibition on cruel and unusual punishments and the Fifth Amendment right against double jeopardy.  (§ 1983 Case, Doc. 40.)  *See also Broom v. Strickland*, 2010 WL 3447741, at *1 (S.D. Ohio Aug. 27, 2010) (Frost, J.).  The defendants moved to dismiss the Amended Complaint, which the court partially granted on August 27, 2010, severing and dismissing Broom's Eighth Amendment claim seeking to bar a second execution attempt without prejudice, but retaining jurisdiction of Broom's other claims challenging the constitutionality of Ohio's lethal injection execution protocol.  *Id.* at *2-4.  The court stated that "[t]here is no doubt that the Eighth Amendment applies to Plaintiff's situation[,]" *id.* at *2, but that "habeas presents the proper vehicle to address the constitutional issues arising from the failed

---

[3] On the same day, Broom filed an action for a writ of habeas corpus in the Ohio Supreme Court seeking to prevent any further execution attempts.  (Case No. 2009-1686.)  He later voluntarily dismissed that action.  *In re Broom*, 123 Ohio St. 3d 1485 (Ohio 2009).

execution attempt and Ohio's intent to try again[,]" *id*. at *4.

In 2011, the Southern Ohio District Court consolidated Broom's § 1983 Case with other § 1983 lethal-injection litigation into a case with more than one hundred death-sentenced inmates as plaintiffs, entitled *In re Ohio Execution Protocol Litigation* (*"IOEPL"*) (Case No. 2:11 CV 1016).  (*See* Case No. 2:09 CV 823, Doc. 284.)

**D.      Second Federal Habeas Corpus Petition**

On September 14, 2010, Broom filed the second-in-time Petition for Writ of Habeas Corpus now before the Court.  (Doc. 1.)  His Petition asserted three claims for relief, stated as:

> 1.      Any further attempts to execute Romell Broom by any means or methods will violate the U.S. Constitution's prohibition against cruel and unusual punishments.
>
> 2.      The prohibition against double jeopardy would be violated by another attempt to execute Romell Broom.
>
> 3.      Any further attempts to execute Broom by any means or methods would violate Broom's right to substantive due process as guaranteed by the Fourteenth Amendment to the United States Constitution.

(Doc. 1-1 at 2-3 (capitalization altered).)[4]

On September 17, 2010, Broom moved to stay the case and hold it in abeyance pending his exhaustion of available state-court remedies for his constitutional challenges to any further execution attempt.  (Doc. 3.)  The Court granted the motion on November 18, 2010.  (Doc. 7.)

**E.      Exhaustion of State-Court Remedies Relating to a Second Execution**

---

[4] All references to page numbers of documents in the Court's electronic court filing system ("ECF") are to the page numbers of the individual ECF documents, not the original page numbers or ECF "PageID" numbers.

**Attempt**

     **1.**     **State Habeas Action**

Meanwhile, on the same day he filed his second federal habeas Petition, September 14, 2010, Broom filed a second state-court habeas action in the Ohio Supreme Court.  *State v. Broom* (Case No. 2010-1609).  He raised four claims, stated as:

1.     Any further attempts to execute Romell Broom will violate the state and federal constitutional prohibitions against cruel and unusual punishments and the Ohio law requiring that executions be quick and painless: Eighth and Fourteenth Amendments to the United States Constitution; Art. I, Sec. 9, 10, and 16 of the Ohio Constitution; Ohio Revised Code § 2949.22(A).

2.     Imposition of the death penalty under the circumstances of this case would violate Article I, Sections 1, 2, 8, 9, 10 and 16 of the Ohio Constitution.

3.     The prohibition against double jeopardy would be violated by another attempt to execute Romell Broom: Fifth and Fourteenth Amendments to the United States Constitution; Art. I, Section 10, Ohio Constitution.

4.     His right to substantive due process would be violated by another attempt to execute Romell Broom; Fourteenth Amendment to the United States Constitution; Art. I, Section 16, Ohio Constitution.

(Doc. 37-1 at 13, 16, 17, 18 (capitalization altered).)

The Ohio Supreme Court summarily dismissed the case on December 2, 2010.  *In re Broom*, 127 Ohio St. 3d 1450 (Ohio 2010).  The Supreme Court denied *certiorari* on May 2, 2011.  *Broom v. Bobby*, 563 U.S. 977 (2011).

     **2.**     **Successive Petition for Post-Conviction and Declaratory Relief**

On September 15, 2010, Broom filed a Successive Petition for Post-Conviction and Declaratory Relief in the state trial court.  (Doc. 19-10 at 2-35.)  He raised four claims, stating:

8

1.   Any further attempts to execute Romell Broom will violate the state and federal constitutional prohibitions against cruel and unusual punishments and the Ohio law requiring that executions be quick and painless: Eighth and Fourteenth Amendments to the United States Constitution; Ohio Revised Code § 2949.22(A).

2.   Imposition of the death penalty under the circumstances of this case would violate Article I, Sections 1, 2, 8, 9, 10 and 16 of the Ohio Constitution.

3.   The prohibition against double jeopardy would be violated by another attempt to execute Romell Broom: Fifth and Fourteenth Amendments to the United States Constitution; Art. I, Section 10, Ohio Constitution.

4.   Broom is entitled to a declaratory judgment in his favor.

(*Id*. at 21, 25, 26, 28.)  Broom sought discovery and an evidentiary hearing.  (*Id*. at 29.)

Without conducting a hearing or allowing discovery, the trial court denied Broom's Petition on April 7, 2011.  (*Id*. at 369-75.)

Broom filed a timely Notice of Appeal with the state appellate court.  (*Id*. at 376-86.)  In his appellate brief, he raised the following assignments of error:

1.   The trial court erred when it denied Broom an evidentiary hearing on his postconviction and declaratory judgment claims.

2.   The trial court erred when it found that the cruel and unusual punishment clauses of the Eighth and Fourteenth Amendments to the United States Constitution, and Article I, Sections 9 and 16 of the Ohio Constitution do not bar another attempt to execute Broom.

3.   Broom's rights under the Ohio Revised Code § 2949.22(A), Article I, Sections 1, 2, 8, 9, 10, and 16 of the Ohio Constitution, and the Due Process Clause of the United States Constitution were violated when the state failed to conduct Broom's execution attempt on September 15, 2009[,] in conformity with Ohio law.

4.   The trial court erred when it found that a second attempt to execute Broom would not violate the prohibitions against being placed twice in jeopardy for the same offense in the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio

9

Constitution.

5.     The trial court erred when it denied Broom declaratory relief under Ohio Revised Code § 2721.01 *et seq*. and Civ. R. 57.

(Doc. 19-11 at 69, 72, 76, 90.)

The state court of appeals affirmed the trial court's judgment on February 16, 2012, with one justice dissenting. *State v. Broom*, No. 96747, 2012 WL 504504 (Ohio Ct. App. Feb. 16, 2012).

Broom filed a timely Notice of Appeal with the Ohio Supreme Court. (Doc. 19-11 at 3-5.) In an Amended Memorandum in Support of Jurisdiction, he raised the following six propositions of law:

1.     In an action for postconviction relief, a petition that presents sufficient operative facts supported by evidence *dehors* the record meets the required pleading standard and, to comport with due process and provide adequate corrective process to the Petitioner, must not be summarily dismissed without an evidentiary hearing. U.S. CONST. AMEND. XIV.

2.     The lower courts erred when they found that the cruel and unusual punishments clauses of the Eighth and Fourteenth Amendments to the United States Constitution, and Article I, Section 9 of the Ohio Constitution, do not bar another attempt to execute Broom.

3.     The lower courts denied Broom due process of law, an adequate corrective process, and his day in court on his "no multiple attempts" claims when (1) the trial court denied him discovery and a hearing, and (2) the appellate court, in a case of first impression and without prior notice to Broom, adopted a new case-specific and fact-based standard for adjudicating Broom's unique and rare constitutional claims, and then refused to remand the case to the trial court so that Broom could develop evidence and present argument that he meets that new standard.

4.     The lower courts erred when they found that a second attempt to execute Broom would not violate the prohibitions against being placed twice in jeopardy for the same offense in the Fifth and Fourteenth

10

Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

5.      The lower courts erred when they denied Broom declaratory relief under Ohio Rev. Code § 2721.01 *et seq*. and Civ. R. 57.

6.      The lower courts erred when they found no denial of Broom's rights under Ohio Revised Code § 2949.22(A), Article I, Sections 1, 2, 8, 9, 10, and 16 of the Ohio Constitution, and the Due Process Clause of the Untied States Constitution when the State failed to conduct Broom's execution attempt on September 15, 2009 in conformity with Ohio law.

(Doc. 19-11 at 103-05 (capitalization altered).)

The court accepted Broom's appeal on his Propositions of Law Nos. 2, 3, and 4 on May 28, 2014.  (*Id*. at 314.)  In his merits brief, Broom presented the following three propositions of law:

1.      The lower courts erred when they found that the Cruel and Unusual Punishments Clauses of the United States and Ohio Constitutions do not bar another attempt to execute Broom.

2.      The lower courts erred when (1) the appellate court adopted a new case-specific and fact-based standard for adjudicating Broom's unique and rare constitutional claims, and then refused to remand the case to the trial court and (2) when the trial court denied him discovery and a hearing.

3.      The lower courts erred when they found that a second attempt to execute Broom would not violate the prohibitions against being placed twice in jeopardy for the same offense in the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

(*Id*. at 320-21 (capitalization altered).)

The Ohio Supreme Court affirmed the state appellate court's judgment in a 4-3 decision on June 9, 2015, finding no constitutional violations.  *Broom*, 146 Ohio St. 3d 60, paragraphs 1, 4, 5 of the syllabus.

11

Broom filed a timely Petition for Writ of *Certiorari* in the United States Supreme Court. (Doc. 19-11 at 602.) The Court denied the Petition, with two justices dissenting. *Broom v. Ohio*, 137 S. Ct. 590 (2016). Broom petitioned for a rehearing, which also was denied. *Broom v. Ohio*, 137 S. Ct. 1138 (2017).

**F.     Reinstated Second Federal Habeas Corpus Action**

Broom has now returned to this Court. On June 20, 2017, he filed an Amended Petition for Writ of Habeas Corpus. (Doc. 18.) Respondent filed a Return of Writ on August 21, 2017. (Doc. 21.)

On September 21, 2017, Broom filed a Motion for Leave to Conduct Discovery and/or to Expand the Habeas Record. (Doc. 22.) He sought discovery relating to his first (Eighth Amendment) and third (due process) claims and requested an expansion of the record. (Doc. No. 22.)[5] On September 27, 2017, Broom filed under seal a motion requesting funding for the assistance of certain experts. (Doc. No. 25.) Respondent opposed Broom's request for discovery on October 5, 2017. (Doc. No. 26.) Broom replied to Respondent's brief in opposition on October 12, 2017. (Doc. No. 27.)

On April 4, 2018, the Court denied Broom's Motions without prejudice, subject to reconsideration or renewal if the Court determines upon further review of the pleadings, that the claims for which Broom seeks discovery were not adjudicated on the merits but are

---

[5] Specifically, Broom requested information regarding Ohio's execution practices and protocols in all executions conducted after his attempted execution in 2009 until the present through: (1) depositions of the ODRC Director Gary Mohr, Southern Ohio Correctional Facility Warden Ron Erdos and six "team members" identified by numbers, responsible for carrying out executions; and (2) documents, records, and transcripts contained in the court record of *IOEPL*. (*Id*. at 14-22.) In addition, or in the alternative, he asked for the record to be expanded to include *IOEPL* records. (*Id*. at 22-23.)

properly preserved for federal habeas review, or the state-court decisions regarding the claims at issue satisfy AEDPA's § 2254(d)(1) or (d)(2), or any other reason consideration of new evidence would be deemed appropriate.  (Doc. 28.)

On June 26, 2018, Broom filed a Traverse.  (Doc. 30.)  On July 10, 2018, he filed a Motion for an Evidentiary Hearing and/or Motion to Expand the Record, requesting an evidentiary hearing in the case and renewing his request in his previous Motion to Expand the Record (Doc. 22), along with certain additional materials.  (Doc. 31.)  Respondent opposed that Motion.  (Doc. 32.)

## PETITIONER'S CLAIMS FOR RELIEF

In his Petition, Broom asserts four claims for relief, stated as follows:

1. Any further attempts to execute Romell Broom by any means or methods will violate the U.S. Constitution's prohibition against cruel and unusual punishments.

2. The prohibition against double jeopardy would be violated by another attempt to execute Romell Broom.

3. The Ohio state courts denied Broom due process of law, and adequate corrective process, and his day in court on his federal constitutional claims.

4. Any further attempts to execute Broom by any means or methods would violate Broom's right to procedural and substantive due process as guaranteed by the Fourteenth Amendment to the United States Constitution.

(Doc. 18 at 64, 85, 103, 119 (capitalization altered).)

## STANDARDS OF REVIEW

13

### A.    AEDPA Review

Broom's Amended Petition for Writ of Habeas Corpus is governed by the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Lindh v. Murphy*,

521 U.S. 320, 336 (1997) (AEDPA governs federal habeas petitions filed after Act's

effective date).  AEDPA, which amended 28 U.S.C. § 2254, was enacted "to reduce delays

in the execution of state and federal criminal sentences, particularly in capital cases, and 'to

further the principles of comity, finality, and federalism.'"  *Woodford v. Garceau*, 538 U.S.

202, 206 (2003) (quoting *(Michael) Williams v. Taylor*, 529 U.S. 420, 436 (2000)).  The

Act "recognizes a foundational principle of our federal system:  State courts are adequate

forums for the vindication of federal rights."  *Burt v. Titlow*, 571 U.S. 12, 18 (2013).  It

therefore "erects a formidable barrier to federal habeas relief for prisoners whose claims

have been adjudicated in state court."  *Id*. at 19.

One of AEDPA's most significant limitations on the federal courts' authority to

issue writs of habeas corpus is found in § 2254(d).  That provision forbids a federal court

from granting habeas relief with respect to a "claim that was adjudicated on the merits in

State court proceedings" unless the state-court decision either:

> (1)    resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the
> Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination
> of the facts in light of the evidence presented in the State court
> proceeding.

28 U.S.C. § 2254(d).

Habeas courts review the "last *explained* state-court judgment" on the federal claim

at issue.  *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis in original).  A state

court has adjudicated a claim "on the merits" and AEDPA deference applies, regardless of

whether the state court provided little or no reasoning at all for its decision.  "When a

federal claim has been presented to a state court and the state court has denied relief, it may

be presumed that the state court adjudicated the claim on the merits in the absence of any

indication or state-law procedural principles to the contrary."  *Harrington v. Richter*, 562

U.S. 86, 99 (2011).

   "Clearly established Federal law" for purposes of  § 2254(d)(1) "is the governing

legal principle or principles set forth by the Supreme Court at the time the state court

renders its decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).  It includes "only the

holdings, as opposed to the dicta, of [Supreme Court] decisions."  *White v. Woodall*, 572

U.S. 415, 419 (2014) (internal quotation marks and citations omitted).  The state-court

decision need not refer to relevant Supreme Court cases or even demonstrate an awareness

of them; it is sufficient that the result and reasoning are consistent with Supreme Court

precedent.  *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).  Also, a state court does not

act contrary to clearly established law when the precedent of the Supreme Court is

ambiguous or nonexistent.  *See, e.g., Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per

curiam).

   A state-court decision is contrary to "clearly established Federal law" under §

2254(d)(1) only "if the state court arrives at a conclusion opposite to that reached by [the

Supreme] Court on a question of law or if the state court decides a case differently than

[the Supreme] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*,

529 U.S. 362, 412-13 (2000).  Also, "review under § 2254(d)(1) is limited to the record
that was before the state court that adjudicated the claim on the merits."  *Cullen v.
Pinholster*, 563 U.S. 170, 181 (2011).

      A state-court decision is an "unreasonable determination of the facts" under §
2254(d)(2) only if the court made a "clear factual error."  *Wiggins v. Smith,* 539 U.S. 510,
528-29 (2003).  The petitioner bears the burden of rebutting the state court's factual
findings "by clear and convincing evidence."  *Burt*, 571 U.S. at 18; *Rice v. White*, 660 F.3d
242, 250 (6th Cir. 2011).  This requirement mirrors the "presumption of correctness"
AEDPA affords state-court factual determinations, which only can be overcome by clear
and convincing evidence.  28 U.S.C.  § 2254(e)(1).[6]  The Supreme Court has cautioned, "'a
state-court factual determination is not unreasonable merely because the federal habeas
court would have reached a different conclusion in the first instance.'"  *Burt*, 571 U.S. at
18 (quoting *Wood v. Allen,* 558 U.S. 290, 301 (2010)).

      Indeed, the Supreme Court repeatedly has emphasized that § 2254(d), as amended
by AEDPA, is an intentionally demanding standard, affording great deference to state-court
adjudications of federal claims.  The Court has admonished that a reviewing court may not
"treat[] the reasonableness question as a test of its confidence in the result it would reach
under *de novo* review," and that "even a strong case for relief does not mean the state
court's contrary conclusion was unreasonable."  *Richter*, 562 U.S. at 102; *see also Schriro*

---

      [6] Section 2254(e)(1) provides:  "In a proceeding instituted by an application for a writ of
habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of
a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the
burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C.
§ 2254(e)(1).

*v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold.").  Rather, § 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal."  *Richter,* 562 U.S. at 102-03 (internal quotation marks omitted).  A petitioner, therefore, "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id*. at 103.  This is a very high standard, which the Court readily acknowledges:  "If this standard is difficult to meet, that is because it is meant to be."  *Id.* at 102.

But AEDPA "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings."  *Id.*  "[E]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.  Deference does not by definition preclude relief."  *Miller-El*, 537 U.S. at 340.  Rather, "under AEDPA standards, a federal court can disagree with a state court's factual determination and 'conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.'"  *Baird v. Davis*, 388 F.3d 1110, 1123 (7th Cir. 2004) (quoting *Miller-El*, 537 U.S. at 340) (Posner, J.).  Federal habeas courts may, for example, review *de novo* an exhausted federal claim where a state court misapplied a procedural bar and did not review the claim on the merits.  *See, e.g., Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005).  They likewise may review *de novo* claims adjudicated on the merits in state court if the petitioner meets the criteria for one of § 2254(d)'s exceptions.  *See, e.g., Wiggins,* 539

17

U.S. at 534 (performing *de novo* review under *Strickland*'s second prong because the state court unreasonably applied the law in resolving *Strickland*'s first prong).

### B.     Exhaustion and Procedural Default

Under AEDPA, state prisoners must exhaust all possible state remedies, or have no remaining state remedies, before a federal court will review a petition for a writ of habeas corpus. 28 U.S.C. § 2254(b) and (c); *see also Rose v. Lundy*, 455 U.S. 509 (1982). This entails giving the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). In other words, "the highest court in the state in which the petitioner was convicted [must have] been given a full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). The exhaustion requirement, however, "refers only to remedies still available at the time of the federal petition." *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982). It "does not require pursuit of a state remedy where such a pursuit is clearly futile." *Wiley v. Sowders*, 647 F.2d 642, 647 (6th Cir. 1981).

Procedural default is a related but "distinct" concept from exhaustion. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). It occurs when a habeas petitioner fails to obtain consideration of a federal constitutional claim by state courts because he failed to: (1) comply with a state procedural rule that prevented the state courts from reaching the merits of the petitioner's claim; or (2) fairly raise that claim before the state courts while state remedies were still available. *See generally Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87 (1977); *Engle*, 456 U.S. at 125 n.28; *Williams*, 460 F.3d at 806.

Where a state court declines to address a prisoner's federal claim because the

18

prisoner has failed to meet a state procedural requirement, federal habeas review is barred as long as the state judgment rested on "independent and adequate" state procedural grounds. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  To be independent, a state procedural rule and the state courts' application of it must not rely in any part on federal law. *Id.* at 732-33.  To be adequate, a state procedural rule must be "'firmly established' and 'regularly followed'" by the state courts at the time it was applied. *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009).[7]

A petitioner also may procedurally default a claim by failing to raise the claim in state court and pursue it through the state's "'ordinary appellate review procedures,'" if, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim.  *Williams*, 460 F.3d at 806 (quoting *O'Sullivan*, 526 U.S. at 848); *see also Baston v. Bagley*, 282 F. Supp. 2d 655, 661 (N.D. Ohio 2003) ("Issues not presented at each and

---

[7] In *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit established the now familiar test to be followed when the state argues that a habeas claim is defaulted because of a prisoner's failure to observe a state procedural rule.  It is:

> First, the federal court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with that rule.  Second, the federal court must determine whether the state courts actually enforced the state procedural sanction – that is, whether the state courts actually based their decisions on the procedural rule.  Third, the federal court must decide whether the state procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim. Fourth, if the federal court answers the first three questions in the affirmative, it would not review the petitioner's procedurally defaulted claim unless the petitioner can show cause for not following the procedural rule and that failure to review the claim would result in prejudice or a miscarriage of justice.

*Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001) (citing *Maupin*, 785 F.2d at 138) (further citations omitted).

19

every level [of the state courts] cannot be considered in a federal habeas corpus petition.").
Under these circumstances, while the exhaustion requirement is technically satisfied
because there are no longer any state-court remedies available to the petitioner, the
petitioner's failure to have the federal claims fully considered in the state courts constitutes
a procedural default of those claims, barring federal habeas review. *Williams*, 460 F.3d at
806, ("Where state court remedies are no longer available to a petitioner because he or she
failed to use them within the required time period, procedural default and not exhaustion
bars federal court review."); *see also Gray v. Netherland*, 518 U.S. 152, 161-62 (1996)
("Because the exhaustion requirement 'refers only to remedies still available at the time of
the federal petition,' . . ., it is satisfied 'if it is clear that [the habeas petitioner's] claims are
now procedurally barred under [state] law' . . . ." (internal citations omitted)).

Furthermore, to "fairly present" a claim to a state court, a petitioner must assert
both its legal and factual basis. *Williams*, 460 F.3d at 806 (citing *McMeans v. Brigano*, 228
F.3d 674, 681 (6th Cir. 2000)). Most importantly, a "'petitioner must present his claim to
the state courts as a federal constitutional issue – not merely as an issue arising under state
law.'" *Id*. (quoting *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)).

In determining whether a claim is procedurally defaulted and barred from
consideration on federal habeas review, the federal court again looks to the last state court
rendering a reasoned opinion on that claim. *Ylst,* 501 U.S. at 805. If the state court
"clearly and expressly states that its judgment rests on a state procedural bar," then the
claim is procedurally defaulted.[8] *Harris v. Reed*, 489 U.S. 255, 263 (1989). Conversely, if

---

[8] Where a later state-court decision rests upon a prohibition against *further* state review,
the decision "neither rests upon procedural default nor lifts a pre-existing procedural default, [and]

the last state court presented with the claim reaches its merits, then the procedural bar is removed and the federal habeas court may consider the merits of the claim in its review. *Ylst*, 501 U.S. at 801.

A petitioner may overcome procedural default by demonstrating cause for the default and actual prejudice that resulted from the alleged violation of federal law, or that there will be a "fundamental miscarriage of justice" if the claim is not considered. *Coleman*, 501 U.S. at 750.  "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot be fairly attributed to him." *Id*. To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage."  *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).  "A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'" *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

A fundamental miscarriage of justice in capital cases also means actually innocent of the death penalty.  *See Sawyer v. Whitley*, 505 U.S. 333, 347 (1992).  In this sense, "[t]o show 'actual innocence' one must show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have found the petitioner eligible for the death penalty under the applicable state law." *Id*. at 336.  This "actual innocence" standard "must focus on the elements that render a defendant eligible for the death penalty." *Hutton*

---

its effect upon the availability of federal habeas is nil . . . ." *Ylst,* , 501 U.S. at 804 n.3.  In that case, habeas courts "look through" that later decision to the prior reasoned state-court judgment. *Id*. at 805 ("state rules against [a] superfluous recourse [of state habeas proceedings] have no bearing upon [a petitioner's] ability to raise the [federal] claim in federal court").

*v. Mitchell*, 839 F.3d 486, 498 (6th Cir. 2016) (citing *Sawyer*, 505 U.S. at 347).

      **C.**      **Cognizability**

      To the extent a claim asserted in a federal habeas petition alleges state-law

violations, it is not cognizable on federal habeas review and should be dismissed on that

basis.  "It is not the province of a federal habeas court to reexamine state-court

determinations on state-law questions.  In conducting habeas review, a federal court is

limited to deciding whether a conviction violated the Constitution, laws, or treaties of the

United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241); *see*

*also Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie

for errors of state law."); *Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982) ("We have long

recognized that a 'mere error of state law' is not a denial of due process.") (citation

omitted)).

      Moreover, "a state court's interpretation of state law, including one announced on

direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."

*Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle*, 502 U.S. at 67-68).  A federal

habeas court does not function as an additional state appellate court reviewing state courts'

decisions on state law or procedure.  *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988).

      State-court rulings on issues of state law may, however, "rise to the level of due

process violations [if] they 'offend[] some principle of justice so rooted in the traditions

and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224

F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).  But

they must be "so egregious that [they] result in a denial of fundamental fairness." *Bugh v.*

*Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  Fundamental fairness under the Due Process

Clause is compromised where "the action complained of . . . violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' . . . and which define 'the community's sense of fair play and decency.'"  *Dowling v. United States*, 493 U.S. 342, 352 (1990) (internal citations omitted).  Courts, therefore, "'have defined the category of infractions that violate 'fundamental fairness' very narrowly.'"  *Id*. (quoting *Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993)).

## DISCUSSION

## I.    AEDPA Deference or *De Novo* Standard of Review

As a preliminary matter, the Court must address the "threshold question" of the proper standard of review governing Broom's claims, or, more precisely, whether AEDPA deference or *de novo* review applies.  *Robinson v. Howes*, 663 F.3d 819, 822 (6th Cir. 2011).  As noted above, AEDPA's deferential standard of review "applies only when a federal claim was 'adjudicated *on the merits* in State court.'"  *Johnson v. Williams*, 568 U.S. 289, 302 (2013) (emphasis in original) (quoting 28 U.S.C. § 2254(d)).  Claims that were not resolved "on the merits" in state court receive the pre-AEDPA standard of review: *de novo* for questions of law (including mixed questions of law and fact) and clear error for questions of fact.  *Robinson*, 663 F.3d at 823.

"A judgment is normally said to have been rendered 'on the merits' only if it was 'delivered after the court . . . heard and *evaluated* the evidence and the parties' substantive arguments."  *Williams*, 568 U.S. at 302 (emphasis in original) (quoting *Black's Law Dictionary* 1199 (9th ed. 2009)).  "Merits" in this context "is defined as *'[t]he intrinsic rights and wrongs of a case* as determined by *matters of substance*, in distinction from matters of form.'"  *Id*. (emphasis in original) (quoting *Webster's New International*

*Dictionary* 1540 (2d ed. 1954)).

Furthermore, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011).  The Supreme Court has found this presumption rebutted, for example, where there was clear evidence "that a federal claim was inadvertently overlooked in state court" and was not "evaluated based on the intrinsic right and wrong of the matter." *Williams*, 568 U.S. at 303.

Broom argues that this Court should review the claims he presents here *de novo* because, in denying him an "adequate corrective process" to litigate those claims, Ohio courts did not adjudicate the claims on the merits and they do not fall within § 2254(d)'s purview.  (Doc. 18 at 40-44; Doc. 30 at 32-34.)  The state courts, he alleges, "failed to allow meaningful factual development, failed to utilize reliable means of finding facts, and made their determinations on an incomplete record."  (Doc. 18 at 40-41.)[9]

Broom focuses almost exclusively on the Ohio Supreme Court's reliance on extra-record evidence in addressing his Eighth Amendment claim.  In considering whether the State was likely to violate its execution protocol and cause severe pain in carrying out a

---

[9] Broom made essentially the same argument to this Court in a Motion for Discovery (Doc. 22).  There, he asserted that discovery relating to his constitutional claims was not barred by *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011), which limits habeas courts' "review under § 2254(d)(1) . . . to the record that was before the state court that adjudicated the claim on the merits," because, due to the state courts' inadequate process, the Ohio Supreme Court did not adjudicate the claims on the merits.  (*See* Doc. 22 at 13-14.)  This Court rejected that argument, finding the claims at issue had been adjudicated on the merits in state court and denied the Motion.  (*See* Doc. 28.)  In his Traverse, Broom reasserts and incorporates by reference the arguments he presented in support of that Motion.  (Doc. 30 at 33.)

second attempt at Broom's execution, the Ohio Supreme Court stated:

> While we acknowledge that the state failed to follow the protocol in 2009 [during the Broom execution attempt], we cannot ignore what has transpired since then. The state has executed 21 death-row inmates since the attempted execution of Broom. *See* Ohio Department of Rehabilitation and Correction, *Ohio Executions – 1999 to Present*, http://www.drc.ohio.gov/web/executed/ executed25.htm (last updated Jan. 16, 2014).

*Broom*, 146 Ohio St. 3d at 73.

This evidence not only was outside the record, Broom argues, it also "was no longer relevant or probative against Broom's claims" because shortly after Broom's failed execution attempt, Ohio changed its execution protocol in significant respects. (Doc. 18 at 41-43.) Broom notes that a dissent to the Ohio Supreme Court's opinion criticized the majority for "seeking evidence outside the record to prove that the state has cured the problems in its execution procedures and seizing on an execution protocol that is no longer in effect." *Broom,* 146 Ohio St. 3d at 74-75 (French, J., dissenting). Broom further asserts the information was "critically incomplete" due to "critical events" that occurred in October 2016, several months after the court issued its decision, when Ohio again changed its execution protocol. (Doc. 22 at 11-13.)

Broom cites as support for his argument *Gordon v. Braxton*, 780 F.3d 196 (4th Cir. 2015), and *Winston v. Kelly* (*Winston I*), 592 F.3d 535 (4th Cir. 2010). (Doc. 30 at 33.) In those cases, the Fourth Circuit held that a state-court judgment on a "materially incomplete record" is not an adjudication on the merits for purposes of § 2254(d), particularly when the state court unreasonably refused to permit further factual development of the claim. *Gordon*, 780 F.3d at 202; *Winston I*, 592 F.3d at 555-56; *see also Winston v. Pearson* (*Winston II*), 683 F.3d 489, 496 (4th Cir. 2012). In *Brown v. Smith*, 551 F.3d 424, 428-29

25

(6th Cir. 2008), the Sixth Circuit similarly found no state-court adjudication of a *Brady* claim where the materials "that form[ed] the basis of the claim" were not before the court.

As Respondent argues, however, the Sixth Circuit rejected this approach in *Ballinger v. Prelesnik*, 709 F.3d 558 (6th Cir. 2013).  (*See* Doc. 26 at 9-10.)  While the court acknowledged in *Ballinger* that the Fourth Circuit's reasoning in *Winston II* – "allowing a petitioner to supplement an otherwise sparse trial court record" – was "appealing, especially where he diligently sought to do so in state court," it nonetheless found that "the plain language of *Pinholster* and *Harrington* precludes it."  *Id*. at 562.  The Sixth Circuit explained, "In *Brown*, we concluded that the state court had not issued a decision on the merits because highly relevant documents were absent from the trial court record."  *Id*. at 561-62.  But after *Harrington*, the court held, "[t]o the extent that *Brown* is inconsistent with *Harrington*'s definition of 'on the merits,' . . . it is no longer the law."  *Id*. at 562.  The Sixth Circuit reaffirmed *Ballinger*'s assessment of *Brown*'s viability in *Loza v. Mitchell*, 766 F.3d 466, 494-95 (6th Cir. 2014), citing *Ballinger* and concluding that "it is unlikely that *Brown* remains good law in light of *Pinholster* and *Harrington.*"  *Accord, Garuti v. Roden*, 733 F.3d 18, 23 (1st Cir. 2013) (refusing to follow *Winston I* and *Winston II* because they were "essentially overruled" by *Pinholster* and *Harrington*).

Nevertheless, Broom persists that at least with regard to his Eighth Amendment claim, *Harrington*'s presumption of adjudication "on the merits" does not apply because there is a "state-law procedural principle[] to the contrary."  (Doc. 27 at 2.)  He points to Ohio law that "bar[s] any appellate decision based on evidence outside the record," citing *Morgan v. Eads*, 104 Ohio St. 3d 142 (Ohio 2004); *Barnett v. Ohio Adult Parole Auth.*, 81 Ohio St. 3d 385, 387 (Ohio 1998); *State v. Ishmail*, 54 Ohio St. 2d 402, para. 1 of the

26

syllabus (Ohio 1978); and *Konigsberg v. Lamports Co*., 116 Ohio St. 640, 641-42 (Ohio

1927).  (Doc. 27 at 2.)

True, the Ohio Supreme Court has held that it is a "bedrock principle of appellate

practice in Ohio" that "'[a] reviewing court cannot add matter to the record before it, which

was not a part of the trial court's proceedings, and then decide the appeal on the basis of

the new matter.'"  *Morgan*, 104 Ohio St. 3d at 144 (quoting *Ishmail*, 54 Ohio St. 2d at para.

1 of the syllabus).  As Respondent argues, however, Ohio courts may take judicial notice of

judicial opinions and public records.  (Doc. 21 at 41 (citing Ohio R. Evid. 201(B)).  *See*

*also State ex rel. Coles v. Granville*, 116 Ohio St. 3d 231, 235-36 (Ohio 2007).

Moreover, Ohio's high court did not decide Broom's Eighth Amendment claim, or

even the narrower issue of whether Broom had established that Ohio was likely to violate

its execution protocol in the future, "on the basis" of the extra-record evidence that Ohio

conducted twenty-one executions after Broom's failed execution attempt.  The high court

concluded that Broom had not met this burden and Ohio had "'a constitutional system that

it appears to be following'" on the basis of the district court's factual findings and legal

conclusions in the *IOEPL* action.  *Broom*, 146 Ohio St. 3d at 72-73 (quoting *IOEPL*

*(Hartman)*, 906 F. Supp. 2d 759, 791 (S.D. Ohio 2012)).  It cited one *IOEPL* decision, for

example, that provided a summary of six executions conducted between April 2012 and

September 2013.  *Id*. at 72 (citing *IOEPL*, 2013 WL 5963150, at *11-16 (S.D. Ohio Nov. 7,

2013)).

Indeed, Broom himself submitted voluminous exhibits to the state courts that

provided information about Ohio's post-Broom executions, primarily witness testimony

and other exhibits from *IOEPL*.  (*See* Docs. 19-4 through19-9; Doc. 19-4 at 4-5 (index of

exhibits).)  The Ohio Supreme Court found:

> Here, there is no indication that further discovery or a hearing is required.
> Broom submitted an affidavit and other documentary exhibits, deposition
> testimony from participants at his attempted execution and other transcripts
> from the federal proceeding in *Cooey v. Strickland*, case No. 2:04–cv–1156,
> 2009 WL 4842393 (S.D.Ohio Dec. 7, 2009), and photographs of his puncture
> marks.  There is no dispute as to any operative fact in connection with the
> events of September 14 and 15, 2009. Although he made a vague request in his
> postconviction petition for discovery and a hearing, a review of the docket
> shows that Broom never filed a discovery request while the matter was pending
> in the trial court. He also has failed to proffer what that additional discovery
> was or how a hearing would aid the trial court in resolving the legal questions
> before it. We agree with the court of appeals that the trial court based its
> decision on the undisputed and voluminous evidence it had and that the trial
> judge did not abuse his discretion in denying Broom's petition without
> additional discovery or an evidentiary hearing. There is no need for remand on
> this issue.

*Broom*, 146 Ohio St. 3d at 67.  Broom, therefore, has not rebutted the *Harrington*

presumption that the Ohio Supreme Court adjudicated his Eighth Amendment claim on the

merits.

The Ohio courts evaluated the evidence presented and the parties' substantive

arguments regarding the intrinsic rights and wrongs of Brooms' claims.  *Williams*, 568 U.S.

at 302.  The decision of the last state court to review the claims, therefore, constitutes a

disposition "on the merits" and is entitled to AEDPA deference under § 2254(d).[10]

## II.      First Claim for Relief: *Eighth Amendment Cruel and Unusual Punishment*

---

[10]  As explained above, Broom has filed a Motion for Evidentiary Hearing and/or To
Expand the Record.  (Doc. 31.)  Because Broom's first claim (Eighth Amendment) and second
claim (Double Jeopardy Clause) were adjudicated on the merits in state courts, the Motion is
denied as to those claims.  A federal habeas court's "review under § 2254(d)(1) is limited to the
record that was before the state court that adjudicated the claim on the merits."  *Pinholster*, 563
U.S. at 181.  And, for that reason, federal evidentiary hearings also are not permissible for habeas
claims adjudicated on the merits by a state court.  *Id*. at 185.  The Motion also is denied as to
Broom's third claim (Ohio's post-conviction process) and fourth claim (due process) because, for
reasons that follow, the third claim is not cognizable on habeas and the fourth claim is meritless.

For his first claim for relief, Broom argues that any further attempt to execute him, by any means or method, would violate the Eighth Amendment's prohibition against cruel and unusual punishments.  (Doc. 18 at 64-85.)  As explained above, Broom raised this claim in state post-conviction proceedings, where it was adjudicated on the merits.  *See Broom*, 2012 WL 504504, at *7-13; *Broom*, 146 Ohio St. 3d at 68-73.  The claim, therefore, is preserved for federal habeas review.

    **A.**       **Eighth Amendment Method-of-Execution Cases**

The Eighth Amendment to the United States Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. CONST. amend. VIII.  The Supreme Court has "time and again reaffirmed that capital punishment is not *per se* unconstitutional."  *Glossip v. Gross*, 135 S. Ct. 2726, 2739 (2015); *see also Gregg v. Georgia*, 428 U.S. 153, 177 (1976).  And, "[w]hile methods of execution have changed over the years, [the Court] has never invalidated a State's chosen procedure for carrying out a sentence of death as the infliction of cruel and unusual punishment."  *Glossip,* 135 S. Ct. at 2732 (internal quotation marks and citation omitted).

The Supreme Court first considered whether particular methods of execution were cruel and unusual punishments in the late nineteenth century.  In *Wilkerson v. Utah*, 99 U.S. 130 (1878), it upheld a sentence of death by firing squad.  The Court compared the practice to executions in eighteenth-century England for various forms of treason, "where the prisoner was drawn or dragged to the place of execution, . . . embowelled alive, beheaded, and quartered, . . . [or] burn[ed] alive . . . ."  *Id*. at 135.  The Court declared it "safe to affirm that punishments of torture, . . . and all others in the same line of unnecessary cruelty, are forbidden" by the Eighth Amendment as they "superadded" pain

29

to the death sentence through "terror, pain, or disgrace."  *Id*. at 135-36.  But the Court did not find the violence and pain associated with execution by firing squad unnecessarily cruel.  *Id*. at 136.

Twelve years later, in *In re Kemmler*, 136 U.S. 436 (1890), the Court considered execution by electrocution.  While it held that the Eighth Amendment did not apply to the states, *id*. at 447-49, the Court nonetheless explored the issue of what makes a punishment sufficiently "cruel" to fall under the Amendment's proscription, opining:

> Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel, within the meaning of that word as used in the [C]onstitution. It implies there [is] something inhuman and barbarous, – something more than the mere extinguishment of life.

*Id.* at 447.  The Court stressed that New York had adopted electrocution in order to replace hanging with "the most humane and practical method known to modern science of carrying into effect the sentence of death in capital cases."  *Id*. at 444 (internal quotation marks and citation omitted).

Most relevant here is the Court's third method-of-execution case, *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459 (1947), in which Louisiana sought to electrocute prisoner Willie Francis a second time after its initial attempt failed because the electric chair malfunctioned.  An official witness to the failed attempt averred that after the executioner threw the switch, "Francis' lips puffed out and he groaned and jumped so that the chair came off the floor.  Apparently the switch was turned on twice . . . ."  *Id*. at 480 n.2.  Francis, who was strapped to the electric chair with a hood covering his eyes, then cried out, "'Take it off.  Let me breath [*sic*].'"  *Id*.  The execution was stopped, and the Governor issued a reprieve.  *Id*. at 460.  The State later submitted evidence that no

electrical current reached Francis' body; his flesh did not show electrical burns; and

Francis told a sheriff after leaving the chair that the electric current had "'tickled him.'"  *Id*.

at 480 n.2.  Francis claimed that a second execution attempt would violate the Fifth

Amendment's prohibition against double jeopardy and the Eighth Amendment's ban on

cruel and unusual punishments.  *Id*. at 461.

     *Resweber* resulted in a splintered decision, in which five justices of the Court – a

four-justice plurality and Justice Frankfurter in a concurring opinion – upheld a second

execution attempt.  *See id*. at 464 (plurality opinion); 471-72 (Frankfurter, J., concurring).

In addressing the Eighth Amendment claim, the justices addressed two issues:  (1) whether

"unnecessary" pain was inflicted in either the failed execution attempt or the proposed

execution, drawing on *Wilkerson* and *Kemmler*; and (2) whether the failed attempt was the

result of an "unforeseeable accident" or was a "wanton infliction of pain."

     Echoing *Kemmler*, the *Resweber* plurality first recognized:

> The traditional humanity of modern Anglo-American law forbids the infliction
> of unnecessary pain in the execution of the death sentence. Prohibition against
> the wanton infliction of pain has come into our law from the Bill of Rights of
> 1688. The identical words appear in our Eighth Amendment. The Fourteenth
> would prohibit by its due process clause execution by a state in a cruel manner.

*Id.* (footnote omitted).  It further explained, "The cruelty against which the Constitution

protects a convicted man is cruelty inherent in the method of punishment, not the necessary

suffering involved in any method employed to extinguish life humanely."  *Id*. at 464.

     Assuming a violation of the Eighth Amendment's Cruel and Unusual Punishments

Clause would violate the Fourteenth Amendment's Due Process Clause,  *id*. at 462, the

Justices found "nothing in what took place [in the execution attempt] which amounts to

cruel and unusual punishment in the constitutional sense." *Id*. at 463.[11]  And they found no

"unnecessary pain involved in the proposed execution."  *Id*.  at 464.  The plurality rejected

Francis' argument that "because he once underwent the psychological strain of preparation

for electrocution, now to require him to undergo this preparation again subjects him to a

lingering or cruel and unusual punishment."  *Id*.  "Even the fact that petitioner has already

been subjected to a current of electricity," they wrote, "does not make his subsequent

execution any more cruel in the constitutional sense than any other execution."  *Id*.

In a concurring opinion, Justice Frankfurter concluded that the Eighth Amendment

did not apply to the states.  *Id*. at 469-70.  But he found that allowing a second execution

attempt would not violate the Due Process Clause as "repugnant to the conscience of

mankind."  *Id*. at 471-72 (internal parenthesis and quotation marks omitted).

In addition, the plurality and Justice Frankfurter both emphasized that Francis'

execution failed because of an accident, which the state officials neither maliciously

intended nor foresaw.  The plurality began its analysis in the case by observing,

> As nothing has been brought to our attention to suggest the contrary, we must
> and do assume that the state officials carried out their duties under the death
> warrant in a careful and humane manner.  Accidents happen for which no man
> is to blame.

*Id*. at 462.  The Justices determined that even when an inmate experiences additional pain

due to a failed execution attempt, if the impediment to the execution was "an accident, with

no suggestion of malevolence," it does not violate the Eighth Amendment.  *Id*. at 463.

They explained,

---

[11] Fifteen years later, the Supreme Court cited *Resweber* alone as support in holding that the Eighth Amendment applies to the states through the Due Process Clause of the Fourteenth Amendment.  *Robinson v. California*, 370 U.S. 660, 666 (1962).

32

> The fact that an unforeseeable accident prevented the prompt consummation of the sentence cannot, it seems to us, add an element of cruelty to a subsequent execution.  There is no purpose to inflict unnecessary pain nor any unnecessary pain involved in the proposed execution.

*Id*. at 464.  The plurality found the situation "just as though he had suffered the identical amount of mental anguish and physical pain in any other occurrence, such as, for example, a fire in the cell block."  *Id*.

Justice Frankfurter agreed, concluding that allowing a second execution attempt after the "innocent misadventure" of the failed attempt did not rise to the level of a due process violation.  *Id*. at 470.  He cautioned, however, that "a series of abortive attempts at electrocution or even a single, cruelly willful attempt" would present a different case.  *Id*. at 471.

The plurality and Justice Frankfurter agreed, therefore, that a second execution attempt is not a cruel and unusual punishment where the initial attempt failed because of an accident and "[t]here [was] no purpose to inflict unnecessary pain nor any unnecessary pain involved in the proposed execution."  *Id*. at 464, 470-71.

The Supreme Court did not review a method of execution again until it recently affirmed the constitutionality of execution by lethal injection in *Glossip v. Gross*, 135 S. Ct. 2726 (2015)*, and *Baze v. Rees*, 553 U.S. 35 (2008).  In *Glossip*, the Court adopted the test for facial method-of-execution challenges established by the controlling opinion in the fractured *Baze* decision:  namely, that prisoners must demonstrate that the method presents a substantial risk of severe pain and there is a readily available alternative procedure. *Glossip*, 135 S. Ct. at 2737 (citing *Baze*, 553 U.S. at 50-52).

The Court noted in both *Glossip* and *Baze* that states have adopted lethal injection

33

as a "more humane way to carry out death sentences." *Id*. at 2732; *see also Baze*, 553 U.S.
at 43 n.1. Nevertheless, it emphasized at the outset of both opinions, "[s]ome risk of pain
is inherent in any method of execution – no matter how humane – if only from the prospect
of error in following the required procedure. . . . [T]he Constitution does not demand the
avoidance of all risk of pain in carrying out executions." *Baze*, 553 U.S. at 47; *see also*
*Glossip*, 135 S. Ct. at 2733. The Court added in *Glossip*, "After all, while most humans
wish to die a painless death, many do not have that good fortune. Holding that the Eighth
Amendment demands the elimination of essentially all risk of pain would effectively
outlaw the death penalty altogether." *Glossip*, 135 S. Ct. at 2733.

A majority of the Court in *Baze* relied on *Resweber* to establish this central
principle. The plaintiffs in *Baze* did not claim that the proper administration of Kentucky's
lethal-injection protocol would constitute "cruel or wanton infliction of pain." *Baze,* 553
U.S. at 49. Rather, they argued that there was a significant risk that the procedures would
not be properly followed, resulting in severe pain. *Id*. The three-justice lead opinion
recognized that it has held "that subjecting individuals to a risk of future harm – not simply
actually inflicting pain – can qualify as cruel and unusual punishment" in cases regarding
prison conditions. *Id*. at 49-50. The Justices noted that prisoners must show a "substantial
risk of serious harm" and "objectively intolerable risk of harm" to challenge conditions of
confinement under the Eighth Amendment. *Id*. at 50 (quoting *Farmer v. Brennan*, 511
U.S. 825, 842, 846, and n.9 (1994)). They then relied on *Resweber* to demonstrate the
limits of this Eighth Amendment protection from the risk of future harm in method-of-
execution cases. *Id*. "Simply because an execution method may result in pain, either by
accident or as an inescapable consequence of death," they pronounced, "does not establish

34

the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual." *Id.*[12]

Justice Thomas, in a concurring opinion joined by Justice Scalia, cited *Resweber,* along with *Wilkerson* and *Kemmler*, to refute the lead opinion's test with its emphasis on risk and alternative methods.  *See id.* at 99-103.  In his view, "[t]he evil the Eighth Amendment targets is intentional infliction of gratuitous pain, and that is the standard our method-of-execution cases have explicitly or implicitly invoked."  *Id.* at 102.  He noted that in *Resweber*, "the Court was confronted in dramatic fashion with the reality that the electric chair involved risks of error or malfunction that could result in excruciating pain." *Id.* at 103.  "But absent 'malevolence' or a 'purpose to inflict unnecessary pain,'" he wrote, "the Court concluded that the Constitution did not prohibit Louisiana from subjecting the petitioner to those very risks a second time in order to carry out his death sentence."  *Id.* (quoting *Resweber,* 329 U.S. at 463, 464 (plurality opinion); 471 (Frankfurter, J., concurring)).  "No one suggested that Louisiana was required to implement additional safeguards or alternative procedures in order to reduce the risk of a second malfunction. And it was the *dissenters* in *Resweber* who insisted that the absence of an intent to inflict pain was irrelevant[,]" he observed.  *Id.* (emphasis in original) (citing *Resweber*, 329 U.S. at 477 (Burton, J., dissenting) ("The intent of the executioner cannot lessen the torture or excuse the result.")).

---

[12] The Court had similarly relied on *Resweber* in conditions-of-confinement cases to demonstrate the boundaries of Eighth Amendment protections.  *See, e.g., Estelle v. Gamble*, 429 U.S. 97, 103, 105 (1976) (citing *Resweber* to support the proposition that "[a]n accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain"); *Glass v. Louisiana*, 471 U.S. 1080, 1085 (1985) (citing *Resweber* to support the proposition that "[a] single, unforeseeable accident in carrying out an execution does not establish that the method of execution itself is unconstitutional").
.

The lead opinion in *Baze* also appears to have affirmed *Resweber*'s cruel-intent requirement.  The Justices noted the *Resweber* plurality's characterization of the failed execution attempt as "'an accident, with no suggestion of malevolence,'" and Justice Frankfurter's comparison of the "'innocent misadventure'" at issue in that case to a hypothetical "'series of abortive attempts.'"  *Id*. at 50 (quoting *Resweber,* 329 U.S. at 463, 464 (plurality opinion); *id*. at 471 (Frankfurter, J., concurring)).  They then concluded that "an isolated mishap alone does not give rise to an Eighth Amendment violation, precisely because such an event, while regrettable, does not suggest cruelty, or that the procedure at issue gives rise to a 'substantial risk of serious harm.'"  *Id.* (quoting *Farmer*, 511 U.S. at 842).  *See also* John Stinneford, *The Original Meaning of "Cruel"*, 105 Geo. L. J. 441, 451-53 (2016) (positing that when *Baze* and *Glossip* were decided, a majority of the Court "expressed sympathy" with the view that a method of execution can only be considered cruel if it is purposely designed to inflict unnecessary pain).[13]

**B.    Ohio Supreme Court Decision**

The Ohio Supreme Court was the last state court to address Broom's Eighth Amendment claim.  After summarizing the applicable federal law, the court reasoned:

---

[13] The Court also recognized *Resweber*'s cruel-intent requirement in establishing the requisite culpable state of mind – "deliberate indifference" – for Eighth Amendment claims regarding conditions of confinement.  *See Estelle v. Gamble*, 429 U.S. 97, 105 (1976) (relying on *Resweber* to demonstrate that "[a]n accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain"); *Wilson v. Seiter*, 501 U.S. 294, 297-98 (1991) (noting that *Resweber* plurality "emphasized that the Eighth Amendment prohibited 'the *wanton* infliction of pain[.]' . . . Because the first attempt had been thwarted by an 'unforeseeable accident,' the officials lacked the culpable state of mind necessary for the punishment to be regarded as 'cruel,' regardless of the actual suffering inflicted") (emphasis in original; internal citations omitted).  *See also Whitley v. Albers,* 475 U.S. 312, 320-21 (1992) (holding that prisoners must show prison officials acted "maliciously and sadistically for the very purpose of causing harm" to establish Eighth Amendment claims of excessive force).

Broom's actual sentence of death is not at issue, nor does this case concern Ohio's chosen method of execution. Instead, Broom asserts that a second execution attempt would constitute cruel and unusual punishment. He claims that what he already experienced went beyond the time, pain, and emotional anguish involved in a "normal" execution. Because there is no guarantee of success, Broom contends, any further attempt to execute him would be cruel and unusual.

Broom's claim has no precedent in Ohio. The United States Supreme Court, however, considered whether a failed execution attempt violated the Eighth Amendment in *Resweber*. After the mechanical difficulty with the electric chair failed to result in Francis's death, a new death warrant was issued. *Id.*, 329 U.S. at 460, 67 S.Ct. 374, 91 L.Ed. 422. Francis objected and argued that once he underwent "the psychological strain of preparation for electrocution," to require him to undergo the preparation a second time would subject him to lingering or cruel and unusual punishment. *Id.* at 464, 67 S.Ct. 374. A four-member plurality rejected this argument, because "[t]he cruelty against which the Constitution protects a convicted man is cruelty inherent in the *method of punishment*, not the necessary suffering involved in any method employed to extinguish life humanely." (Emphasis added.) *Id.* at 464, 67 S.Ct. 374.

The dissenting justices noted that electrocution is statutorily and constitutionally permissible only if it is "so instantaneous and substantially painless that the punishment shall be reduced, as nearly as possible, to no more than that of death itself." *Id.* at 474, 67 S.Ct. 374 (Burton, J., dissenting). The dissenters rejected the prospect of execution by installments, what they termed "a delayed process of execution." *Id.* at 474–475, 67 S.Ct. 374.

Justice Frankfurter cast the deciding vote. He joined the plurality to reject Francis's appeal because he did not believe that the Fourteenth Amendment made the Bill of Rights applicable to the states. FN1. According to Justice Frankfurter, the Due Process Clause of the Fourteenth Amendment limited a state's criminal procedures only insofar as a state practice " 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.' " *Id.* at 469, 67 S.Ct. 374 (Frankfurter, J., concurring), quoting *Snyder v. Massachusetts,* 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934). Justice Frankfurter did not believe that Louisiana's treatment of Francis rose to that level. As a result, Willie Francis went to the electric chair a second time.

FN 1. The United States Supreme Court later repudiated Frankfurter's position: The Due Process Clause of the Fourteenth Amendment does incorporate the Eighth Amendment's protections against cruel and unusual punishments to apply to the states. *Robinson v. California*, 370 U.S. 660, 666–667, 82 S.Ct.

1417, 8 L.Ed.2d 758 (1962).

Based on *Resweber,* we determine, as did the Eighth District, that there is no per se prohibition against a second execution attempt based on the Cruel and Unusual Punishments Clause of the Eighth Amendment. The state's intention in carrying out the execution is not to cause unnecessary physical pain or psychological harm, and the pain and emotional trauma Broom already experienced do not equate with the type of torture prohibited by the Eighth Amendment.

Having determined that allowing the state to go forward with Broom's execution does not amount to a per se violation of the Eighth Amendment, we consider whether it is violated under the test set forth in *Glossip* and *Baze*. Broom argues that the state should have known of the potential problems with his execution beforehand. He submitted evidence that the state experienced problems establishing and maintaining IV catheters during the previous executions of Joseph Clark and Christopher Newton and that problems should have been expected when Broom's first vein assessment indicated that there may be trouble accessing the veins. But, it is unclear from the record why Broom's execution team was unable to establish IV access. Although Dr. Heath suggested that it was poor technique, it is Broom's burden to establish that he is likely to suffer severe pain if required to undergo a second execution.

Further, in December 2009, less than three months after the attempt to execute Broom, the Sixth Circuit rejected a constitutional challenge to Ohio's execution protocol, noting that "[s]peculations, or even proof, of medical negligence in the past or in the future are not sufficient to render a facially constitutionally sound protocol unconstitutional." *Cooey*, 589 F.3d at 225. The protocol that the Sixth Circuit reviewed in *Cooey* has been amended and we cannot assume that the same problems with IV access will befall Broom again.

Broom also contends that the state's violation of the execution protocols indicates that prison officials were not blameless and created a substantial risk of harm. We agree that compliance with execution protocols is the best way to avoid the risk of severe pain, but deviation from a protocol is not an automatic constitutional violation. *See In re Ohio Execution Protocol Litigation (Wiles)*, 868 F.Supp.2d 625, 626 (S.D.Ohio 2012) (protections of the United States Constitution "do not require perfect adherence to every single provision of Ohio's execution protocol without deviation"). We are not convinced, however, that Broom has established that the state is likely to violate its execution protocol in the future.

Following the events of September 15, 2009, the state was enjoined from carrying out the executions of Kenneth Smith and Charles Lorraine based in large part on the federal district court's determination that Ohio was not

38

following its execution protocol. *See Cooey v. Kasich*, 801 F.Supp.2d 623 (S.D.Ohio 2011); *In re Ohio Execution Protocol Litigation (Lorraine)*, 840 F.Supp.2d 1044 (S.D.Ohio 2012).

The state sought to address the concerns of the federal district court. It amended the protocol, adding a new command structure and forms that were required to be filled out as each step of the protocol was completed to ensure compliance. *Wiles* at 629–632. The state sufficiently demonstrated a commitment to follow the protocol and was allowed to proceed with the execution of Mark Wiles. *Id*. at 652. Several more executions occurred without any apparent violation of the protocol. *In re Ohio Execution Protocol Litigation (Phillips)*, S.D.Ohio No. 2:11–cv–1016, 2013 WL 5963150, *11–16 (Nov. 7, 2013). This led the district court to conclude that " 'Ohio does not have a perfect execution system, but it has a constitutional system that it appears to be following.' " *Id*., quoting *In re Ohio Execution Protocol Litigation* (Hartman), 906 F.Supp.2d 759, 791 (S.D.Ohio 2012).

While we acknowledge that the state failed to follow the protocol in 2009, we cannot ignore what has transpired since then. The state has executed 21 death-row inmates since the attempted execution of Broom. *See* Ohio Department of Rehabilitation and Correction, *Ohio Executions—1999 to Present*, http://www.drc.ohio.gov/web/executed/executed25.htm (last updated Jan. 16, 2014).

To be clear, the state must comply with the protocol as amended. Strict compliance with the protocol will ensure that executions are carried out in a constitutional manner and can also prevent or reveal an inmate's attempt to interfere with the execution process. FN2. We simply are unable to conclude that Broom has established that the state in carrying out a second attempt is likely to violate its protocol and cause severe pain.

FN 2. At oral argument, the state speculated that Broom himself caused the difficulty in accessing his veins by taking antihistamines to dehydrate himself. There was also a reference in the official timeline of Broom's execution that the "[m]edical team [was] having [a] problem maintaining an open vein due to past drug use." However, there is no evidence in the record supporting either allegation. We mention these allegations only to illustrate that following the current execution protocol could reveal potential problems with IV access. For instance, the protocol requires four vein checks and a review of the inmate's medical chart, which may include information regarding prior drug use. Ohio Department of Rehabilitation and Correction, *Policy No. 01–COM–11*, at 6, 9, 11, http://www.drc.ohio.gov/web/drc_policies/documents/01-COM-11.pdf (accessed Jan. 25, 2016). Also, after transfer to the Death House, the inmate is

to be constantly monitored by at least three members of the execution team who are required to maintain an execution timeline. *Id*. at 2 and 9. The execution timeline is supposed to record certain specified events, such as the vein checks and other information at the discretion of the execution team. *Id*. at 2. And certainly, the ingestion of antihistamines should be a noteworthy event.

We therefore conclude that the Eighth Amendment does not bar the state from carrying out Broom's execution.

*Broom,* 146 Ohio St. 3d at 70-73.

**C.       Analysis**

Broom argues that the Ohio Supreme Court's decision rejecting his Eighth

Amendment claim "was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States[.]"  28

U.S.C. § 2254(d)(1).[14]  (*See* Doc. 18 at 68.)

**1.       Clearly Established Supreme Court Precedent**

The "threshold question" under § 2254(d)(1) is what "clearly established" Supreme

Court precedent governs Broom's Eighth Amendment second-attempt claim.  *Williams v.*

*Taylor*, 529 U.S. 362, 390 (2000).  As noted above, "clearly established Federal Law" in §

2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's

decisions as of the time of the relevant state-court decision."  *Id.* at 412; *see also Thaler v.*

_____

[14]  Broom also claims the Ohio Supreme Court's decision "was based on an unreasonable determination of the facts in light of the evidence presented" under § 2254(d)(2).  (Doc. 18 at 68.) As Respondent points out, however (Doc. 21 at 41), Broom does not dispute any specific factual finding of the state court.  (*See* Doc. 30 at 39 ("[T]o the extent that the Ohio Supreme Court determined the facts in such a way that Broom was not entitled to relief . . .[,] the state court's decision is based upon an unreasonable determination of the facts in light of the evidence presented.").)  And the Ohio Supreme Court observed, "There is no dispute as to any operative fact in connection with the events of September 14 and 15, 2009."  *Broom*, 146 Ohio St. 3d at 67. This Court, therefore, will not address that aspect of Broom's Eighth Amendment claim.

*Haynes*, 559 U.S. 43, 47 (2010) (per curiam) ("A legal principle is 'clearly established' within the meaning of [§ 2254(d)(1)] only when it is embodied in a holding of th[e] [Supreme] Court.").

The Supreme Court recently has articulated a restrictive view of what constitutes clearly established law for purposes of § 2254(d)(1).  *See generally House v. Hatch*, 527 F.3d 1010, 1015-17 (10th Cir. 2008).  In *Carey v. Musladin*, 549 U.S. 70 (2006), it clarified that "clearly established Federal law" consists of "Supreme Court holdings in cases where the facts are at least closely-related or similar to the case *sub judice*.  Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context."  *Id*. at 1017.  "In conducting the 'clearly established' inquiry," therefore, "lower courts must narrowly construe Supreme Court precedents and, as a consequence, 'clearly established' law 'consist[s] only of something akin to on-point holdings.'"  *Pouncy v. Palmer,* 846 F.3d 144, 161 (6th Cir. 2017) (quoting *House*, 527 F.3d at 1015).  In *Wright v. Van Patten*, 552 U.S. 120 (2008), for example, the Court reversed a grant of habeas relief because no Supreme Court decision had "squarely address[ed]" the issue or "clearly establish[ed]" that law developed in a different context applied to the facts of that case.  *Id.* at 125.

Broom argues that the Ohio Supreme Court should not have relied on *Resweber* as the clearly established law governing his Eighth Amendment claim.  He first contends the decision is "archaic" and has been eclipsed by the Court's "modern Eighth Amendment standards," clearly established in cases such as *Trop v. Dulles*, 356 U.S. 86 (1958).  (Doc. 18 at 68-71; Doc. 30 at 36-39).  He refers to Chief Justice Warren's often-cited

41

pronouncement in *Trop,* a condition-of-confinement case, that "[t]he [Eighth] Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop*, 356 U.S. at 101.  *Trop* also established the fundamental Eighth Amendment principle that "[t]he basic concept underlying the Eighth Amendment is nothing less than the dignity of man." *Id.* at 100.  Respondent counters that the Ohio Supreme Court correctly identified *Resweber* as controlling precedent, as it is the only United States Supreme Court case to address an Eighth Amendment challenge to a second execution attempt, albeit by a different mechanism; electrocution.  (*See* Doc. 21 at 36-39.)

The Court agrees with Respondent.  Although *Resweber* was decided more than seventy years ago, it still "squarely addresses" the issue in this case:  whether a second execution attempt is a cruel and unusual punishment under the Eighth Amendment.  *Van Patten,* 552 U.S. at 125.  The decision remains good law; the Supreme Court has never overruled it or, to this Court's knowledge, even questioned it.

Indeed, the Supreme Court's treatment of *Resweber* leaves little doubt that the decision remains a viable and significant precedent, despite its age and fractured composition.  The Court consistently has cited *Resweber* as one of its landmark Eighth Amendment cases.  *See, e.g., Furman v. Georgia,* 408 U.S. 238, 326, 393 n.17, 423 (1976); *Gregg v. Georgia,* 428 U.S. 153, 170-171, 178 (1976); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Glass v. Louisiana*, 471 U.S. 1080, 1085 (1985); *Baze v. Rees*, 553 U.S. 35, 50, 61, 103 (2008); *Glossip v. Gross*, 135 S. Ct. 2726, 2732 (2015).  Most notably, as discussed above, the Court relied on *Resweber* to buttress a key principle underlying its two most recent method-of-execution cases, *Baze v. Rees* and *Glossip v. Gross*:  that an execution

42

method is not cruel and unusual "[s]imply because [it] may result in pain, either by accident or as an inescapable consequence of death . . . ." *Baze,* 553 U.S. at 50; *see also Glossip,* 135 S. Ct. at 2733.

Trop's "evolving standard of decency" and "dignity of man" principles, on the other hand, are "far too abstract to establish clearly the specific rule" governing Broom's claim. *Lopez v. Smith*, 135 S. Ct. 1, 4 (2014).  In determining what is "clearly established" Supreme Court precedent, courts may not "'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule'" not announced by the Supreme Court.  *Id.* (quoting *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013)); *see also House*, 527 F.3d at 1016 n.5 (habeas courts may not "extract clearly established law from the general legal principles developed in factually distinct contexts.").  *Trop's* principles, however fundamental to Eighth Amendment jurisprudence, do not address "the specific question presented by this case" and cannot be used to guide habeas courts in reviewing a state-court decision under § 2254(d)(1).  *Smith*, 135 S. Ct. at 4.

Broom also argues that *Resweber* cannot constitute clearly established law for purposes of § 2254(d)(1) because it is a plurality decision in which a majority of justices agreed only that the Eighth Amendment does not apply to the states.  (Doc. 30 at 35-36.) He cites as support *Marks v. United States*, 430 U.S. 188 (1977), which holds, "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds."  *Id.* at 193 (quotation marks and editorial marks omitted)); *see also Panetti v. Quarterman*, 551 U.S.

43

930, 948-49 (2007) (applying *Marks* to a splintered decision of the Court and concluding

that the narrowest rule "constitutes clearly established law for purposes of § 2254.")

(Internal quotation marks omitted).

It is true that Justice Frankfurter opined that the Eighth Amendment did not apply

to the states.  *Resweber*, 329 U.S. at 469.  But the *Resweber* plurality did not.  Although, as

Broom points out, the plurality cited in a footnote several earlier cases in which the Court

had declined to incorporate the Fifth and Eighth Amendments, *see id.* at 462 n.2, it

expressly stated that it would review Francis' claims "under the assumption, *but without so*

*deciding*," the incorporation issue.  *Id.* at 462 (emphasis added).  Five justices, therefore,

did not agree in *Resweber* that the Eighth Amendment did not apply to the states and that is

not the case's holding under *Marks*.[15]

As explained above, however, five justices did agree in *Resweber* that a second

execution attempt was not unconstitutional because the initial attempt was impeded by an

accident and the state did not intend to inflict unnecessary pain in the failed attempt or in

the proposed execution.  *Id.* at 464, 471.  Justice Marshall recognized this holding in his

concurring opinion in *Furman v. Georgia*, *supra*.  He wrote that in *Resweber*, "[f]ive

members of the Court . . . held that the legislature adopted electrocution for a humane

purpose, and that its will should not be thwarted because, in its desire to reduce pain and

suffering in most cases, it may have inadvertently increased suffering in one particular

---

[15] In fact, as noted above, the Supreme Court cited *Resweber* alone as support for its later
holding that the Eighth Amendment applies to the states through the Due Process Clause of the
Fourteenth Amendment.  *Robinson v. California*, 370 U.S. 660, 666 (1962).

case." *Furman,* 408 U.S. at 326 (Marshall, J., concurring).[16]  Justice Marshall specifically discounted the fact that Justice Frankfurter applied the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment's Cruel and Unusual Punishments Clause to Francis' second-attempt claim, concluding that "in substance, his test was fundamentally identical to that used by the rest of the Court." *Id.* at 326 n.28.  Justice Powell also observed in dissent that "it seems clear that the tests for applying the [two clauses] are fundamentally identical." *Id.* at 422 n.4 (Powell, J., dissenting). *See also Gregg,* 428 U.S. at 170-71(describing *Resweber*'s holding as "second attempt at electrocution found not to violate Eighth Amendment, since failure of initial execution was 'an unforeseeable accident' and '[t]here was no purpose to inflict unnecessary pain nor any unnecessary pain involved in the proposed execution.'") (Editing marks and citation omitted).

  *Resweber* is a viable and important Supreme Court decision that is directly on point.  It is therefore the clearly established law controlling Broom's Eighth Amendment claim for purposes of this Court's review under § 2254(d)(1).[17]

### 2.  State Court's Application of *Resweber*

  Broom contends that even if *Resweber* is the clearly established law governing his

---

[16] Justice Marshall added in a footnote that English law required a second attempt at execution if the first attempt failed. *Furman*, 408 U.S. at 326 n.30 (citing L. Radzinowicz, A History of English Criminal Law 185-86 (1948)).

[17] Of course, as Respondent argues (Doc. 21 at 39), because *Resweber* is the only Supreme Court case that squarely addresses Broom's Eighth Amendment claim, if it did not "clearly establish" law controlling this claim – whether because of its age or plurality composition – then there is no governing federal law and habeas relief is barred by § 2254(d). *See Smith,* 135 S. Ct. at 4.

Eighth Amendment claim, the Ohio Supreme Court unreasonably applied it.  The state

court made quick work of *Resweber* in analyzing Broom's claim.  It first determined that,

based on *Resweber*, there was no "per se prohibition" against Ohio attempting to execute

Broom a second time.  *Broom*, 146 Ohio St. 3d at 71.  The court then observed, "The

state's intention in carrying out the execution is not to cause unnecessary physical pain or

psychological harm, and the pain and emotional trauma Broom already experienced do not

equate with the type of torture prohibited by the Eighth Amendment."  *Id.*

The state court next considered Broom's claim under the first prong of the

*Baze/Glossip* test – namely, whether a second execution attempt presents a substantial risk

of serious harm – and found it did not.[18]  *Id.* at 71-73.  In doing so, it addressed two

arguments posed by Broom:  (1) "the state should have known of the potential problems

with [Broom's] execution beforehand," *id.* at 71; and (2) "the state's violation of the

execution protocols indicates that prison officials were not blameless and created a

substantial risk of harm," *id.* at 72.  These issues mirror *Resweber*'s examination of

whether:  (1) the execution attempt was unsuccessful because of an unforeseeable accident;

and (2) there was unnecessary pain inflicted in the initial execution attempt and a risk of

---

[18] The Ohio Supreme Court applied only the first prong of the *Baze*/*Glossip* test because the second prong, requiring an available alternative method, does not apply to Broom's claim.  As the state court acknowledged, Broom did not challenge Ohio's lethal-injection method of execution on its face.  *See id.* at 70 ("nor does this case concern Ohio's chosen method of execution").  Similarly, here, he seeks to bar Ohio from attempting to execute him again "by any means or methods, including any adopted after the State's failed attempt[.]"  (*See, e.g.*, Doc. 18 at 47 n.5.)

unnecessary pain in the proposed execution.[19]

  *The failed execution attempt: "unforeseeable accident" or "wanton infliction of pain.*"  The Ohio Supreme Court found that the State did not intend to cause harm in the execution attempt and it rejected Broom's argument that the State should have foreseen the problems with accessing Broom's veins because it had encountered similar difficulties in previous executions and Broom's first vein assessment indicated "that there may be trouble accessing the veins."  *Broom*, 146 Ohio St. 3d at 71-72.  The state court noted that Broom's expert, Dr. Mark Heath, attributed the execution team's inability to obtain IV access to the team's medical incompetence, but the court found the cause of the problems "unclear."  *Id*. at 72; *see also id*. at 73 n.2 (noting State's allegations at oral argument that Broom himself may have been to blame by taking antihistamines to dehydrate himself and a reference in the official timeline of Broom's execution to difficulties with Broom's veins because of his past drug use, but acknowledging that there was no evidence in the record to support either allegation).

  Here, Broom asserts that, unlike the electric chair's mechanical malfunction in *Resweber,* his failed execution was not the result of an "unforeseeable accident."  As he argued in state court, he claims the State's inability to access a vein was foreseeable because similar problems had occurred in prior executions and the execution team knew

---

  [19] Broom argues the state court misapplied *Baze* and *Glossip* to his second-attempt claim, as those cases concerned facial attacks on methods of execution.  (Doc. 18 at 83.)  A habeas court, however, need only determine whether the state court's reasoning and the result are consistent with the controlling clearly established Supreme Court precedent.  *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).  Because the state court's *Baze/Glossip* analysis addressed issues that are also relevant under *Resweber*, the court's application of *Baze* and *Glossip* was consistent with *Resweber.*

Broom's veins were at least partially compromised before the procedure.  Yet, rather than act in a "careful and humane manner" in carrying out Broom's execution, the State officials and execution team deviated from Ohio's lethal-injection protocol in numerous respects, most notably, in IV training and pre-execution vein checks.  (Doc. 18 at 74-75.)

It is undisputed that Ohio had difficulties with IV access in executions conducted before Broom's.  Ohio Supreme Court Justice French wrote in dissent:

> The Broom execution attempt was not the first time the medical execution team had difficulty inserting an IV catheter. During Ohio's very first lethal injection, that of Wilford Berry in 1999, the medical team members responsible for the IV catheter line were unable to locate a vein in Berry's arm and had to call a third team member for assistance. When the state executed Christopher Newton in 2007, the medical team needed approximately 90 minutes to establish two IV lines. And during the 2009 execution of Marvallous Keene, the team had to switch to a backup line because they could not get fluid to flow.
>
> But the most disastrous execution prior to the attempted execution of Broom was that of Joseph Clark on May 2, 2006. Based on the end-of-the-day needle count in Clark's case, the execution team used 17 or 18 needles trying to establish two IV lines and never did manage to install the backup line before ultimately executing him. As in Broom's case, Dr. Heath was critical of the decision in Clark's case to continue fruitlessly trying to establish the IV, testifying that he would not subject a patient to more than six to ten attempts, because "any normal practitioner" will recognize by that point that the effort is futile and is only inflicting needless pain on the patient.

*Broom*, 146 Ohio St. 3d at 77 (French, J., dissenting).[20]

The Ohio Supreme Court also acknowledged that Ohio failed to follow its protocol during the Broom execution attempt.  *Id.* at 73.[21]  The record shows that prison officials

---

[20] These facts are not in dispute.  The Ohio Supreme Court stated, "There is no dispute as to any operative fact in connection with the events of September 14 and 15, 2009."  *Broom*, 146 Ohio St. 3d at 67.

[21] Ohio first began using lethal injection as a means of execution in 1993, and it became Ohio's sole method of execution in 2001.  *See Cooey v. Strickland*, 479 F.3d 412, 416 (6th Cir. 2007).  Ohio specified lethal injection by statute, but its protocol (referring to its policies,

permitted execution team members to miss required training sessions before his execution.
(Doc. 19-7 at 221-22 (Kerns Depo.).)  There was no backup plan in the event IV access
could not be obtained or maintained.  (*Id*. at 32 (Collins Depo.).)  And there was no record
in the execution timeline that a third required vein check was performed the day of the
execution.  (*See* Doc. 19-9 at 89-94 (Execution Timeline).)

Justice French provided this summary of Dr. Heath's testimony at an *IEOPL*
hearing in which he criticized the execution team's performance at Broom's execution
attempt:

> As Dr. Heath explained, execution drugs are administered through a peripheral
> IV catheter, which consists of a hollow needle surrounded by a plastic tube
> called the catheter. The practitioner inserts both the needle and the catheter into
> the vein. Thus, although blood draws and IV catheters both involve needle
> pricks, the latter also includes the insertion of an object with a wider diameter.
>
> Dr. Heath testified that in Broom's case, the medical team inserted the catheters
> improperly and in a fashion likely to cause greater pain:
>
>> And what [Broom] described did not sound right to me at all in terms
>> of proper procedure. He described the depth into his muscle which they
>> were pushing the catheter, going all the way up to the hub of the
>> catheter, which is well over an inch deep, and going in at a very steep
>> angle, which does not comport with proper technique or what's going
>> to be a successful technique for getting a catheter into a vein.
>>
>> Q: And what kind of—what kind of response would a human body
>> have to that kind of technique?
>>
>> A: It would hurt.

---

practices and procedures) for administering lethal injection is not established by statute,
administrative rule, or regulation.  *Id*. at 426.  *See* Ohio Rev. Code § 2949.22; DRC Policy 01-
COM-11.  The promulgation and implementation of Ohio's lethal-injection protocol, therefore, "is
solely within the discretion of the ODRC, which "can change the protocol at any time, regardless
of whether an inmate is scheduled for execution."  *Cooey,* 479 F.3d at 426.  And Ohio has done
just that on numerous occasions.  *See Cooey v. Strickland*, 588 F.3d 924, 927 (6th Cir. 2009).

The fact that the medical team attempted to insert the catheter into Broom's arm in a nearly perpendicular line "bespeaks of bizarre and certainly poor technique" that had "no possibility of achieving insertion." Even the Lucasville physician inserted the catheter into Broom's ankle at the wrong angle, which is why she struck bone.

On two occasions, after getting the catheter into Broom's veins, team members "botched up that relatively simple process of attaching the I.V. tubing into the hub of the catheter, and blood sprayed everywhere." Compounding the problem, the team member who inserted the catheter was not wearing gloves during the procedure, thereby increasing the risk of unsuccessfully attaching the tubing.

Dr. Heath testified that clinical competence demands that attempts at peripheral IV access be abandoned long before the 19th attempt. The Lucasville physician agreed with this assessment, testifying that if she had known that 18 attempts had already been made on Broom, she never would have stuck him with a needle. And although it can be proper practice to "fish" a vein—partially withdrawing a catheter, then reinserting it at a different angle—it was "completely unacceptable [and] far beyond any acceptable standard" to have made as many insertion attempts through the same needle holes as the medical team apparently did.

* * *

Dr. Heath offered a simple explanation for the state's failures: incompetence. "[I]t is my opinion that the veins on Mr. Broom's arms, other areas of his body, should be easily accessible by a competent team." Part of the problem, he opined, arose from the fact that Ohio had lax standards regarding who may install a peripheral IV catheter during an execution. The person inserting the peripheral IV catheter should be someone who performs that task as part of his or her daily job duties. But Ohio's protocol required only one year of experience, with no limitation on how remote in time that experience might be.

Team Member 9, who participated in the Broom procedure, is a phlebotomist. But drawing blood, which is what phlebotomists do, is a "much easier and simpler" process that is "far less fraught with problems" than inserting a catheter in order to inject drugs into the body. Dr. Heath testified that allowing a phlebotomist such as Member 9 to handle the insertion at an execution is "deeply inappropriate and reflects a deep misunderstanding and deep inability of what is needed to assemble an appropriate [execution] team."

*Broom*, 146 Ohio St. 3d at 76-78 (French, J., dissenting).

But these circumstances, however troubling in hindsight, did not render the failed

50

execution attempt reasonably foreseeable.  "The test of foreseeability is that which is objectively reasonable to expect, not merely what might conceivably occur.  Harm that is merely possible is not necessarily reasonably foreseeable."  57A AM. JUR. 2d *Negligence* § 124 (2018).

The fact that the execution team had difficulties in prior executions does not show that state officials expected or reasonably should have expected those problems to reoccur at Broom's execution.  As the Ohio Supreme Court noted, the Sixth Circuit has rejected this argument in upholding Ohio's lethal-injection protocol, finding that "'[s]peculations, or even proof, of medical negligence in the past or in the future are not sufficient to render a facially constitutionally sound protocol unconstitutional.'"  *Broom*, 146 Ohio St. 3d at 72 (quoting *Cooey II v. Strickland*, 589 F.3d 210, 225 (6th Cir. 2009)).  "Permitting constitutional challenges to lethal injection protocols based on speculative injuries and the possibility of negligent administration," the circuit court continued, "is not only unsupported by Supreme Court precedent but is also beyond the scope of our judicial authority."  *Cooey II*, 589 F.3d at 225 (citing *Gregg*, 428 U.S. at 174-75).

In fact, as Broom acknowledges (*see* Doc. 18 at 52, 74), in May 2009, after the Clark execution and before the Broom execution attempt, Ohio revised its written execution protocol to address problems with establishing and maintaining IV lines, adding training requirements and vein checks.  *See Cooey v. Strickland*, 610 F. Supp. 2d 853, 926 (S.D. Ohio 2009).  It stated:

> Every possible effort shall be made to anticipate and plan for foreseeable difficulties in establishing and maintaining the intravenous (IV) lines.  The condemned prisoner shall be evaluated by appropriately trained medical staff on the day of arrival at the institution, to evaluate the prisoner's veins and plan for the insertion of the IV lines.  This evaluation shall include a "hands-on"

> examination as well as a review of the medical chart, to establish any unique
> factors which may impact the manner in which the execution team carries out
> the execution.  At a minimum, the inmate shall be evaluated upon arrival, later
> that evening at a time to be determined by the warden, and on the following
> morning prior to nine a.m.  Potential problems shall be noted and discussed,
> and potential solutions considered, in advance of the execution.

(Doc. 19-10 at 360 (May 2009 Execution Protocol).)  The protocol also required that every

team member be trained in "the insertion of the IV needles" and "signs of IV incontinence .

. . ."  (*Id*. at 358.)  Broom does not point to any evidence that State officials or the

execution team expected or should have expected that these measures would not be

followed.

Nor does the record support Broom's argument that State or prison officials,

including the execution team members, expected or reasonably should have expected to

have problems with IV access based on observations of Broom's veins.  As the Ohio

Supreme Court noted, at Broom's first required vein check the day before the execution

attempt, the nurse and phlebotomist who assessed Broom's veins recorded in the execution

timeline that the veins of his left arm were "not as visible or palpable" as those of his right

arm.  (Doc. 19-9 at 96 (Execution Timeline).)  This means they found "accessible" veins on

his right arm and had reason to believe they could access those veins.  The required second

vein check was performed that evening and noted in the timeline, but no specific

observations were recorded.  (*Id.* at 95.)  There was no mention in the timeline of a third

vein assessment, which the protocol required to be performed the morning of the execution.

Broom claims the check was never done, but the only evidence of this that he cites from the

state-court record is the execution timeline itself, which makes no reference to it at all.

(*See, e.g.*, Doc. 18 at 53, 75; Doc. 30 at 18.)  It is possible that the vein check was

52

performed but never noted in the timeline.  *See Cooey v. Kasich*, 801 F. Supp. 2d 623, 633-34 (S.D. Ohio 2011) (stating that Team Member #10,  who had been on the execution team for every execution since 1999, testified that all three vein assessments had been performed for each execution and should have been conducted and recorded with Broom's, but conceded that the morning of Broom's execution attempt was "hectic" and the vein assessment may have occurred but was inadvertently omitted from the timeline).

The only indication that State or prison officials had that Broom's veins may be compromised, therefore, was one observation of diminished visibility and palpability of veins on one arm.  And they did not expect to have difficulties with IV access based on that observation.  Prison officials advised the ODRC regional director, Edwin Voorhies Jr., of the finding and the medical team "assured him this would not present a problem."  *Broom*, 146 Ohio St. 3d at 61.  The ODRC director at the time, Terry Collins, testified in *IOEPL* that he and the prison officials had "no reason to believe that morning they were going to have problems" with Broom's veins.  (Doc. 19-7 at 32 (Collins Depo.))

Broom's own expert, Dr. Heath, testified at an *IOEPL* hearing that, based on his observations, Broom's veins should have been "easily accessed by a competent team." (Doc. 19-10 at 155-57 (Heath Test.))  He stated that he met with and examined Broom about a week after the failed execution attempt.  (*Id*. at 156-57.)  But he found nothing in Broom's self-reported medical history that would explain why the execution team was unable to obtain intravenous access.  (*Id*. at 156.)  He also explained that Broom exercised regularly, which should have made his veins more accessible.  (*Id*.)  And, Broom denied that he had ever engaged in intravenous drug use and Dr. Heath observed no scars or other damage indicating intravenous drug use.  (*Id*.)  Based on observations of Broom's veins

alone, therefore, State officials and prison officials should not have reasonably expected to encounter problems establishing IV access for Broom's execution.

In fact, the biggest problem with establishing IV access to Broom's veins was not *finding* a vein, it was *maintaining* access to a vein.  As the Ohio Supreme Court reported, many prison officials and execution team members testified that team members were able to access veins, but could not maintain that access.  *See, e.g., Broom*, 146 Ohio St. 3d at 62-63.  Warden Kerns testified, for example, "We actually hit the veins, and as soon as we would start a saline drip the vein would bulge . . . so you can't use it, you have to make another attempt."  (Doc. 19-7 at 187 (Kerns Depo.)).  It eventually became clear to everyone involved, he stated, that, based on "how many times we actually got a good vein but it just wouldn't hold," they may not be able to find a viable vein and the execution would have to be canceled.  (*Id.* at 192.)

Dr. Heath himself did not attempt to access Broom's veins; he only identified veins and opined on theoretical access.  (*See* Doc. 19-10 at 155-57; 164-70 (Heath Test.)).  As Broom argues, his expert was clear in his criticism of the execution team's technique in inserting the catheter and the number of insertions made.  (*See id.*)  But Broom points to only one criticism Dr. Heath made of the team's ability to maintain venous access (and the Court cannot find any other testimony of his on that subject):  Dr. Heath describes possibly two instances in which the execution team "botched up that relatively simple process of attaching the I.V. tubing into the hub of the catheter . . . ."  (*Id.* at 167.)  It appears Dr. Heath did not provide an opinion regarding the reason the team was unable to maintain venous access once it was established.  In fact, Dr. Heath acknowledged he did not know exactly what caused the problem, testifying:

> In terms of putting in peripheral access, I think the thing that is most informative to me is their failure to do it on Mr. Broom, who has easy veins. And I'm not sure – I can't come up with any explanation for why they couldn't do it other than either they're not competent or there's something about the environment or the circumstances that made them unable to function at their normal level of expertise.  Something went wrong there.

(*Id.* at 164.)  It is possible, as the state court recognized, that the "circumstances" impeding IV access could have included Broom's veins being compromised, for whatever reason, and unable to withstand the intravenous procedures.  *See Broom*, 146 Ohio St. 3d at 73 n.2.

The Ohio Supreme Court reasonably concluded, therefore, that the cause of the IV problems during Broom's failed execution attempt was "unclear."  *Id.* at 72.  And if, ultimately, the cause of the problems maintaining IV access is unclear, it is impossible to say that it could or should have been foreseen.  Given Ohio's prior problems establishing IV access in the Clark and Newton executions, and given the observation that Broom's veins on his left arm were compromised, it certainly was *possible* that problems may occur with Broom's IV access.  But that does not mean that State or prison officials should have reasonably *expected* that to happen, especially in light of their new protocol and Broom's other apparently viable veins.

Moreover, foreseeability alone does not determine what qualifies as an "accident" under *Resweber*.  As explained above, to prevail on his second-attempt claim, *Resweber* requires that Broom show not only that the failed attempt was foreseeable in the sense of being *unexpected*; it requires that Broom demonstrate that State or prison officials possessed a *cruel or malicious intent* to deliberately inflict pain, either in their actions during the failed execution attempt or in the execution procedure's design.  But he asserts only conclusory allegations of the State's cruel intent.  (*See, e.g.*, Doc. 18 at 64 ("The State

55

was deliberately indifferent to the risks.").  See also Doc. 18 at 67 ("pain, suffering and distress were deliberately and intentionally inflicted upon Broom"; "The State exhibited cruel indifference to Broom's rights and his humanity on September 15, 2009.")).

Accordingly, Broom has not shown that the failed execution attempt was a foreseeable and "cruelly willful attempt" under *Resweber*.  *Resweber*, 329 U.S. at 463, 471.

*Infliction of "unnecessary pain."*  The Ohio Supreme Court provided a vivid account of Broom's execution attempt and recognized that Broom "was in a great deal of pain" during the procedure.  *Broom*, 146 Ohio St. 3d at 61-63.  But it concluded that the physical and psychological trauma Broom experienced did not amount to "the type of torture prohibited by the Eighth Amendment."  *Id.* at 71.  The state court also rejected Broom's argument that Ohio was likely to violate its lethal injection protocol in a second attempt and seriously harm him based on Ohio's corrective amendments of its protocol, the numerous successful executions since Broom's failed execution and the Sixth Circuit's affirmance of Ohio's lethal-injection protocols as constitutional.  *Id.* at 72-73.

Broom argues that the Ohio court unreasonably applied *Resweber* in making these determinations.  As to the failed execution attempt, he contends it "constituted both physical and psychological torture."  (*Id.* at 8.)  It was "more painful and physically invasive," he asserts, than the attempt in *Resweber*.  (*Id.* at 76-78.)  He argues that each needle stab constituted a separate battery.  (*Id.* at 78.)  Broom recounts that he suffered eighteen to nineteen painful wounds at multiple places on his body; one needle hit his ankle bone; he bled from his wounds; he cried out in pain at times and eventually sobbed; and his bruises were still apparent three days later.  (*Id.* at 77; *see also id.* at 58-59.)  He further claims the psychological suffering was greater than in *Resweber* as he was left in "a state

56

of terror" for two hours rather than the short period of time Willie Francis suffered.  (*Id.* at

8; Doc. 30 at 38.)  The physical and psychological pain together, he asserts, made the failed

execution attempt "even worse than a 'mock execution.'"  (Doc. 18 at 70.)

>    As Respondent argues, however, the source of difficulties in Broom's execution

attempt, obtaining IV access, was a "necessary suffering involved" in preparatory

procedures for a method of execution (lethal injection) that has repeatedly been found

constitutional, rather than a "cruelty inherent in the method of punishment[.]"  *Resweber*,

329 U.S. at 464; *see also Baze* 553 U.S. at 47 ("Some risk of pain is inherent in any method

of execution – no matter how humane – if only from the prospect of error in following the

required procedure.").  After all, the State did not administer lethal drugs in Broom's

attempted execution; whereas in *Resweber*, Willie Francis was subjected to electrical

currents.  In fact, Broom never left the holding cell for the execution chamber.  (*See, e.g.,*

Doc. 19-7 at 202 (Kerns Depo.)).

>    Regarding the proposed execution, Broom focuses on the psychological pain it

would inflict.  He argues that the execution would be cruel and unusual because the severe

trauma he experienced in the failed attempt would substantially increase the psychological

impact and pain from a second attempt.  (Doc. 30 at 37-38.)  "Exposure to or threatened

death," he explains, is a psychiatrically recognized trauma.  (*Id.* at 37 (quoting *Diagnostic

and Statistical Manual of Mental Disorders* § 309.81 (5th ed. 2013)).  Broom also points to

Ohio Supreme Court Justice O'Neill's comment in his dissent that "a second execution

attempt after even one extremely painful and unsuccessful attempt is precisely the sort of

'lingering death' that the United States Supreme Court recognized as cruel within the

meaning of the Eighth Amendment 125 years ago."  *Broom*, 146 Ohio St. 3d at 84 (quoting

*In re Kemmler*, 136 U.S. at 447). *See also Sireci v. Florida*, 137 S. Ct. 470, 470 (2016) (Breyer, J., dissenting from denial of *certiorari*) (noting Court's denial of Broom's *certiorari* petition and questioning whether a second attempt to execute Broom would amount to a cruel and unusual punishment, citing *Kemmler*'s statement that "'[p]unishments are cruel when they involve . . . a lingering death'") (quoting *In re Kemmler*, 136 U.S. at 447). And he cites the Supreme Court's recognition of Eighth Amendment protection against cruel and unusual punishment that cause psychological pain in *Trop v. Dulles*, 356 U.S. 86, 101-02 (1958).

   *Trop* is not controlling clearly established federal law here, as it concerned the constitutionality of expatriation, not a second execution attempt. *See Wright v. Van Patten*, 552 U.S. 120, 125 (2008). And in *Resweber,* which is the governing clearly established federal law, the plurality expressly rejected the petitioner's argument that having "once underwent the psychological strain of preparation for electrocution, now to require him to undergo this preparation again subjects him to a lingering or cruel and unusual punishment." *Resweber*, 329 U.S. at 464. The Court explained, "The situation of the unfortunate victim of this accident is just as though he had suffered the identical amount of mental anguish and physical pain in any other occurrence, such as, for example, a fire in the cell block." *Id. See also Estelle v. Gamble*, 429 U.S. 97, 105 (1976) (citing *Resweber* for proposition that "[a]n accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain."). See also *Adams v. Bradshaw*, 826 F.3d 306, 320 (6th Cir. 2017) (finding no "clearly established" Supreme Court precedent for purposes of § 2254(d)(1) prohibiting death-penalty protocols that cause psychological harm).

58

Furthermore, nothing in the record refutes the Ohio Supreme Court's finding that "the state's intention in carrying out the [proposed] execution is not to cause unnecessary physical pain or psychological harm . . . ."  *Broom*, 146 Ohio St. 3d at 71.  And, as the state court noted, "we cannot assume that the same problems with IV access will befall Broom again."  *Id* at 72.  Indeed, the Sixth Circuit repeatedly has upheld Ohio's lethal-injection protocols as constitutional.  *See, e.g., IOEPL*, 881 F.3d 447, 454 (6th Cir. 2018) (October 2016 protocol), *cert. denied*, 139 S. Ct. 216 (2018); *IOEPL*, 860 F.3d 881, 884-85 (6th Cir. 2017) (October 2016 protocol); *Cooey v. Strickland*, 604 F.3d 939, 944 (6th Cir. 2010) (November 2009 protocol, "Plan B"); *Cooey II*, 589 F.3d at 215-20 (November 2009 protocol).  In reviewing the protocol revised after Broom's failed execution, the circuit court observed:

> The unfortunate incident of Ohio's unsuccessful execution of Broom does not distinguish Ohio's protocol from [Kentucky's protocol] in *Baze*. When administered properly, both protocols are humane and constitutional. Ohio's protocol, like Kentucky's, is regrettably open to the possibility of mistaken application. The complete eradication of all risk of accident, however, is not yet possible, and the assertion that the mere possibility of future improper administration of the lethal injection despite the training and safeguards is too "attenuated" and "speculative"—and certainly not intended—to constitute cruel and unusual punishment.

*Cooey II*, 589 F.3d at 228.

Few would disagree that Ohio's failed attempt to execute Broom was a deeply "unfortunate incident."  Nevertheless, Broom has not demonstrated that the state court was objectively unreasonable in deciding that the pain and trauma he endured as a result of the State's initial execution attempt and the psychological pain he may experience in a second attempt do not rise to the level of an Eighth Amendment violation.  The Ohio Supreme Court's decision denying Broom's Eighth Amendment claim, therefore, was neither

contrary to, nor an unreasonable application of, *Resweber*.  Broom's first claim for relief

fails.

**III.     Second Claim for Relief:  *Double Jeopardy***

For his second claim for relief, Broom argues that any further attempt to execute

him would violate the Fifth Amendment's guarantee against double jeopardy.  (Doc. 18 at

85-103.)  Broom presented this claim to state courts, which adjudicated it on the merits.

*See Broom*, 146 Ohio St. 3d at 65-66.  This claim, therefore, is ripe for habeas review.

The Fifth Amendment to the United States Constitution guarantees that no person

shall "be subject for the same offence to be twice put in jeopardy of life or limb . . . ."  U.S.

CONST. amend. V.  The Double Jeopardy Clause provides criminal defendants with three

distinct protections, barring a second prosecution for the same offense after acquittal, a

second prosecution for the same offense after conviction, and multiple punishments for the

same offense.  *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969), *overruled on other*

*grounds*, *Alabama v. Smith*, 490 U.S. 794 (1989).

The Ohio Supreme Court was the last state court to address Broom's double-

jeopardy claim.  After summarizing the federal and state law on the issue, it reasoned:

> Broom argues that a second execution attempt would be an unconstitutional
> second punishment. He contends that for double-jeopardy purposes, the attempt
> to execute him began with the reading of the death warrant or at the very latest
> with the first insertion of a needle. Broom claims that once the attempt to
> execute him began, he had a reasonable expectation in the "finality" of his
> death sentence, meaning that his death should have occurred on September 15,
> 2009, because R.C. 2949.22(B) requires that a death sentence shall be executed
> on the day designated by a court. Because his life was once placed in
> "jeopardy" by virtue of the two hours of painful efforts to insert needles into
> his body, Broom argues, he may not again be required to undergo that same
> punishment.
>
> The court of appeals rejected this claim on the grounds that Broom has not yet

been punished because his punishment is death: "An inmate can only be put to death once, and that process legislatively begins with the application of the lethal drugs." 2012-Ohio-587, 2012 WL 504504, ¶ 23, citing R.C. 2949.22(A). The court relied on *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947), in making this conclusion. In *Resweber*, Willie Francis was placed in the electric chair, but when the switch was thrown, there was a mechanical difficulty and death did not result. *Id.* at 460, 67 S.Ct. 374. A plurality of the United States Supreme Court held that a proposed second attempt to execute Francis did not violate the Fifth, Eighth or Fourteenth Amendments. Because the court viewed the failed execution as an accident, it determined that the Double Jeopardy Clause did not preclude the state from carrying out the sentence. *Id.* at 463, 67 S.Ct. 374.

The Eighth District noted that the *Resweber* dissenters "distinguished the application of electricity to the inmate from merely placing the inmate in the electric chair with no application of electricity." 2012-Ohio-587, 2012 WL 504504, at ¶ 22. By analogy, the court of appeals reasoned, the insertion of IV lines is merely a "preparatory" step to the execution. Until the lethal drugs flow through the tubes, the court reasoned, the state has not yet punished Broom within the meaning of the Fifth Amendment. *Id.* at ¶ 23. Thus, according to the court, the Double Jeopardy Clause has no application to multiple execution attempts. *Id.* at ¶ 25.

The state agrees with the assessment of the court of appeals. It contends that when the preparatory actions proved unsuccessful, the state halted the execution and the imposed sentence was never carried out. Therefore, the state argues, a second attempt to carry out that sentence will not violate the Double Jeopardy Clause. The state cites R.C. 2949.22(A), which provides that "a death sentence shall be executed *by causing the application to the person*, upon whom the sentence was imposed, of *a lethal injection of a drug or combination of drugs*." (Emphasis added.) The state reads this language to mean that the execution attempt does not begin until lethal force or measure is applied.

We agree. There is no question that lethal drugs did not enter Broom's body. The execution attempt was halted after preparations to establish a viable IV line were unsuccessful. The establishment of viable IV lines is a necessary preliminary step, but it does not, by itself, place the prisoner at risk of death. As the statute makes clear, the execution commences when the lethal drug enters the IV line. In this case, because the attempt did not proceed to the point of injection of a lethal drug into the IV line, jeopardy never attached. Because there is no violation of the Fifth Amendment protection against double jeopardy, the state is not barred from a second attempt to execute Broom's death sentence.

*Broom*, 146 Ohio St. 3d at 65-66.

61

Broom argues that in this decision, the Ohio Supreme Court "failed to apply the governing federal constitutional principles, and it misapplied the law" under § 2254(d)(1). (Doc. 18 at 88.)[22]  The threshold question, again, is what clearly established federal law governs.  *Williams v. Taylor*, 529 U.S. 362, 390 (2000).

Respondent maintains that *Resweber* controls this claim, clearly establishing that the Double Jeopardy Clause does not prohibit a second execution attempt after a failed first attempt.  (Doc. 21 at 44-45.)  The *Resweber* plurality assumed, without deciding, as it did regarding the Eighth Amendment, that a violation of the Fifth Amendment would violate the Due Process Clause of the Fourteenth Amendment.  *Resweber*, 329 U.S. at 462.  And it began its analysis by stressing the significance of the double-jeopardy protection:  "First.  Our minds rebel against permitting the same sovereignty to punish an accused twice for the same offense."  *Id*.  The plurality then analogized the case to *Palko v. Connecticut*, 302 U.S. 319 (1937), in which a state tried a defendant a second time for a death-eligible offense after the defendant was previously acquitted on that charge.  *Id*.  The *Palko* Court held that the Fifth Amendment did not apply to the states, and concluded that the "kind of double jeopardy" to which the defendant was subjected in that case was not a "hardship so acute and shocking that our polity will not endure it" so as to violate the Fourteenth Amendment.  *Palko*, 302 U.S. at 328.  The justices found *Palko* "decisive."  *Resweber*, 329 U.S. at 463.  "For we see no difference from a constitutional point of view," they explained, "between a new trial for error of law at the instance of the state that results in a

---

[22] Broom also argues, as he did with his first claim for relief, that the state court unreasonably determined the facts in deciding this claim.  (Doc. 18 at 88.)  But he does not dispute any specific state-court determinations of fact, and this Court, therefore, will not consider this claim under § 2254(d)(2).

death sentence instead of imprisonment for life and an execution that follows a failure of equipment." *Id*.  The justices continued,

> When an accident, with no suggestion of malevolence, prevents the consummation of a sentence, the state's subsequent course in the administration of its criminal law is not affected on that account by any requirement of due process under the Fourteenth Amendment. We find no double jeopardy here which can be said to amount to a denial of federal due process in the proposed execution.

*Id*. at 463.

As with the Eighth Amendment claim, Justice Frankfurter found that the Fifth Amendment did not apply to the states and generally opined that a second execution attempt would not violate due process.  *Id*. at 469-70.

Broom agrees with Respondent that *Resweber* clearly established that a failed execution attempt implicates double-jeopardy protection.  (Doc. 30 at 40-41.)  But he argues that the plurality's conclusion that no double-jeopardy violation occurred should not be followed because the justices were "constrained by" the *Palko* decision, which the Court expressly overruled in *Benton v. Maryland*, 395 U.S. 784 (1969).  (*Id*. 41-42.)  In *Benton*, the Court held that the Fifth Amendment applies to the states and under the Double Jeopardy Clause, unlike the "watered-down standard" of jeopardy enunciated in *Palko*, a state is not permitted a second attempt to obtain a death sentence.  *Benton*, 395 U.S. at 793-95.  Broom argues that *Benton* now also governs his claim, establishing that "double jeopardy precludes states from making multiple attempts to *complete* a death sentence where the first attempt failed due to error of the state."  (Doc. 30 at 42 (emphasis in original)).

Broom asserts that other Supreme Court precedent governs this claim as well, citing

63

a line of cases prohibiting states from increasing or augmenting a criminal sentence once the sentence has begun and the defendant has a reasonable expectation of its finality.  (Doc. 18 at 86-88;  Doc. 30 at 42-43 (citing, among other cases, *United States v. Halper*, 490 U.S. 435, 441 (1989); *North Carolina v. Pearce*, 395 U.S. 711 (1969); *United States v. DiFrancesco*, 449 U.S. 117, 127-28 (1980))).  This authority, he maintains, supports his claim that "jeopardy 'attached' no later than the point when, under all the facts and circumstances of the first attempt, Broom had the legitimate expectation of finality in the completion of his death sentence that day."  (Doc. 18 at 89.)

Broom's arguments are unavailing.  First, *Benton*'s holding regarding multiple prosecutions and the Supreme Court precedent concerning increased sentencing do not "squarely address[]" the issue of a second execution attempt and therefore cannot constitute clearly established law under § 2254(d)(1).  *Wright v. Van Patten*, 552 U.S. 120, 125 (2008).

Second, it is not clear what impact *Benton* has on the precedential value of the *Resweber* plurality's double-jeopardy analysis.  The justices expressly assumed that the Fifth Amendment's Double Jeopardy Clause applied to Francis' claim and seemed to rely on *Palko* more as a persuasive factual analogy than for its "watered-down standard" of double jeopardy the Court later rejected in *Benton*.  Their conclusion, therefore, that the failed execution attempt did not constitute a double-jeopardy violation because it resulted from "an accident, with no suggestion of malevolence," *Resweber*, 329 U.S. at 463, may survive *Benton*.

But either way, *Resweber* does not help Broom.  To the extent *Resweber* clearly established only that the Double Jeopardy Clause may under some circumstances prohibit a

64

second execution attempt, Broom's claim fails because the Ohio Supreme Court neither contravened, nor misapplied that narrow holding.  The state court considered the merits of Broom's claim and it reasonably concluded that Broom was not placed in jeopardy during the failed execution attempt because "[t]he establishment of viable IV lines [was] a necessary preliminary step, but it [did] not, by itself, place [Broom] at risk of death." *Broom*, 146 Ohio St. 3d at 66.  And to the extent *Resweber* also clearly established that there is no double jeopardy where an execution attempt was unsuccessful due to an "innocent misadventure," *Resweber*, 329 U.S. at 471, Broom's claim still fails for the same reasons his Eighth Amendment claim fails:  he has not demonstrated that the State and prison officials either expected the initial execution attempt to be unsuccessful or maliciously intended it to be unsuccessful.  Finally, if *Resweber* is no longer good law on this issue because of *Benton*, then there is no clearly established federal law controlling Broom's double-jeopardy claim and he cannot prevail under §2254(d)(1) for that reason. *See, e.g., Lopez v. Smith*, 135 S. Ct. 1, 4 (2014).

Broom further argues that the Ohio Supreme Court's decision was unreasonable because it applied a state statute to determine whether jeopardy had "attached," which can only be determined by federal law.  (Doc. 18 at 93-94 (citing *Crist v. Bretz*, 437 U.S. 28, 38 (1978); *Missouri v. Hunter*, 459 U.S. 359, 368 (1983); *Hoffler v. Bezio*, 726 F.3d 144, 156 (2d Cir. 2013))).  The state court referenced Ohio's lethal-injection statute, which "makes clear" that "execution commences when the lethal drug enters the IV line[,]" and concluded that "because the attempt did not proceed to the point of injection of a lethal drug into the IV line, jeopardy never attached."  *Broom*, 146 Ohio St. 3d at 66.  *Resweber*, however, never addressed the issue of when jeopardy attaches and there is no clearly established

65

Supreme Court precedent that does so in this context.  Moreover, in *Resweber*, Willie Francis was subjected to electrical currents, yet the Court still found no double-jeopardy violation.

Accordingly, the Ohio Supreme Court's determination that the State's proposed execution of Broom does not violate the Fifth Amendment's Double Jeopardy Clause was neither contrary to, nor an unreasonable application of, *Resweber*.

**IV.    Third Claim for Relief:** *Due Process Violation / Ohio Post-Conviction Procedures*

Broom argues in his third claim for relief that the Ohio state courts denied him due process by failing to provide an adequate corrective process through its scheme for post-conviction relief.  (Doc. 18 at 103-18.)  Specifically, Broom faults the trial court's denial of his requests in post-conviction proceedings for discovery, funds for expert witnesses and an evidentiary hearing.  (*See id.* at 105.)  Broom presented this claim to state courts and the Ohio Supreme Court adjudicated it on the merits.  *See Broom*, 146 Ohio St. 3d at 66-67.  Respondent, however, contends this claim is not cognizable on federal habeas review.  (Doc. 21 at 49-51.)  The Court agrees.

The Sixth Circuit repeatedly has held that errors in state post-conviction proceedings are outside the scope of federal habeas corpus review.  *See, e.g., Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007); *Roe v. Baker*, 316 F.3d 557, 571 (6th Cir. 2002); *Greer v. Mitchell,* 264 F.3d 663, 681 (6th Cir. 2001); *Kirby v. Dutton*, 794 F.2d 245, 246 (6th Cir. 1986).  This is because "'the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody.'"  *Kirby,* 794 F.2d at 246 (quoting *Preiser v.*

66

*Rodriguez*, 411 U.S. 475, 484 (1973)).  Challenges to post-conviction proceedings "address collateral matters and not the underlying state conviction giving rise to the prisoner's incarceration."  *Id.* at 247.  A due-process claim related to collateral post-conviction proceedings, therefore, even if resolved in a petitioner's favor, would not "result [in] . . . release or a reduction in . . . time to be served or in any other way affect his detention because we would not be reviewing any matter directly pertaining to his detention."  *Id.* Claims based on a state's post-conviction process, therefore, cannot be brought in federal habeas proceedings.  *Id*. at 246.

Indeed, the Sixth Circuit court recently declined to revisit this long-standing precedent, noting that it has never been overruled in an *en banc* proceeding and the Supreme Court has never ruled to the contrary.  *Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 854-55 (6th Cir. 2017).  Moreover, the Sixth Circuit explained, "in the absence of Supreme Court precedent evaluating the constitutional adequacy of state post-conviction review proceedings, [the petitioner] cannot establish the necessary precondition for issuance of the writ—namely, that the decision of the Ohio Court of Appeals, which clearly evaluated the merits of his claim, 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'"  *Id*.

Broom's third claim for relief, therefore, also fails.

**V.      Fourth Claim for Relief:  *Due Process Violation / Ohio Statutory Right to a Quick and Painless Death***

In Broom's fourth claim for relief, he asserts that Ohio violated his procedural and substantive due-process rights by failing to protect his statutorily-created liberty and

property interests in a "quick and painless execution." (Doc. 18 at 119.)  Section

2949.22(A) of the Ohio Revised Code provides that "a death sentence shall be executed by

causing the application to the person, upon whom the sentence was imposed, of a lethal

injection of a drug or combination of drugs of sufficient dosage to quickly and painlessly

cause death."  Ohio Rev. Code § 2949.22(A).  Respondent argues that this claim is

procedurally defaulted and meritless.  (Doc. 21 at 52-55.)

Respondent contends this claim is procedurally defaulted because Broom did not

raise it before the Ohio Supreme Court.  (Doc. 21 at 52-53.)  As Broom points out,

however, he presented the claim to Ohio's high court as his sixth proposition of law in his

Amended Memorandum in Support of Jurisdiction.  (*See* Doc. 19-11 at 158-61.)  This

claim was fairly presented to state courts and is not procedurally defaulted.

Respondent is correct, however, that this claim lacks merit.  Broom cites no clearly

established Supreme Court precedent recognizing a federal due process right based on this

Ohio statute, or any other similar state statute.  "Given the lack of holdings from [the]

Court regarding [the issue] involved here, it cannot be said that the state court

'unreasonabl[y] appli[ied] clearly established law" under § 2254(d)(1).  *Carey v. Musladin*,

549 U.S. 70, 77 (2006).  In fact, the Sixth Circuit rejected this very claim in the § 1983

lethal-injection litigation, opining:

> Biros also claims that the planned execution will violate his right to a "quick
> and painless death." . . . He cites Ohio Revised Code § 2949.22(A), the statute
> that provides for a death caused by "a lethal injection of a drug ... of sufficient
> dosage to quickly and painlessly cause death." But § 2949.22 creates no cause
> of action to enforce any right to a quick and painless death. *See State v. Rivera*,
> Nos. 08CA009426, 08CA009427, 2009 WL 806819, at *7 (Ohio Ct.App. Mar.
> 30, 2009) ("There is no 'action' for a quick and painless death" under Ohio
> Reg.Code Ann. § 2949.22(A).). We are not persuaded by Biros's assertion that
> § 2949.22 creates a federal right because the statute creates "liberty and

68

property interests in a 'quick and painless execution' " protected by the substantive component of the Due Process Clause of the Fourteenth Amendment. . . . Biros is unlikely to show that the reach of any such right extends beyond the incorporation of the Eighth Amendment. *Cf. Furman v. Georgia*, 408 U.S. 238, 359 n. 141, 92 S.Ct. 2726, 33 L.Ed.2d 346 (Marshall, J., concurring).

*Cooey II,* 589 F.3d at 234 (citations omitted).

Accordingly, the state court's decision rejecting Broom's fourth claim for relief neither contravened nor misapplied clearly established federal law and this claim is also denied.

### CERTIFICATE OF APPEALABILITY ANALYSIS

The Court must now determine whether to grant a Certificate of Appealability ("COA") for any of Broom's claims for relief.  The Sixth Circuit has held that neither a blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability." *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001); *see also Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001) (remanding motion for certificate of appealability for district court's analysis of claims).

Habeas courts are guided in their consideration of whether to grant a COA by 28 U.S.C. § 2253, which provides in relevant part:

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from --

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court . . .

69

(2) A certificate of appealability may issue under paragraph (12) only if the applicant has made a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253.  This language is identical to the requirements set forth in the pre-AEDPA statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause. The sole difference between the pre- and post-AEDPA statutes is that the petitioner must now demonstrate he was denied a *constitutional*, rather than federal, right.  *Slack v. McDaniel*, 529 U.S. 473, 483-04 (2000) (interpreting the significance of the revision between the pre- and post-AEDPA versions of that statute).

Furthermore, if a habeas claim is not procedurally defaulted, then the court need only determine whether reasonable jurists would find the district court's decision "debatable or wrong." *Id*. at 484.  A more complicated analysis is required, however, when assessing whether to grant a COA for a claim the district court has determined is procedurally defaulted.  In those instances, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id*.

After taking the above standards into consideration, the Court will not issue a COA for Broom's third claim for relief (Ohio's post-conviction scheme), as it is not cognizable on federal habeas review, and Broom's fourth claim for relief (due process), as no jurist of reason would debate the Court's conclusion on that claim.  The Court will issue a COA for Broom's first (Eighth Amendment) and second (Fifth Amendment) claims for relief.  A reasonable jurist could debate the Court's conclusions regarding these claims.

## CONCLUSION

70

For the foregoing reasons, the Court denies Broom's Amended Petition for Writ of Habeas Corpus.  (Doc. 18.)  The Court further certifies that, pursuant to 28 U.S.C. § 1915(a)(3), an appeal from this decision could be taken in good faith as to Broom's first and second claims for relief and the Court issues a certificate of appealability pursuant to 28 U.S.C. § 2253(c) and Federal Rule of Appellate Procedure 22(b) as to those claims only. As to the remaining claims, the Court certifies that, pursuant to 28 U.S.C. § 1915(a)(3), an appeal from this decision could not be taken in good faith and that there is no basis upon which to issue a certificate of appealability.  28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

IT IS SO ORDERED.


March 21, 2019                           s/ Christopher A. Boyko
Date                                     Christopher A. Boyko
                                         United States District Judge